954 So.2d 1058 (2006)
Paul E. CHISM et al.
v.
JEFFERSON COUNTY and Travis A. Hulsey, as revenue director of Jefferson County.
1050046.
Supreme Court of Alabama.
August 16, 2006.
As Modified October 5, 2006.
Order Overruling Rehearing October 5, 2006.
*1060 Sam C. Pointer, Jr., of Lightfoot, Franklin & White, LLC, Birmingham; and Henry E. Simpson and Joseph H. Johnson, Jr., of Adams & Reese/Lange Simpson, LLP, Birmingham, for appellants.
William M. Slaughter, J. Vernon Patrick, Mark E. Ezell, and Mark D. Hess of Haskell, Slaughter, Young & Rediker, LLC, Birmingham; and E.A. Strickland and Jeffrey M. Sewell of Jefferson County Law Department, for appellees Jefferson County, Travis A. Hulsey, as revenue director of Jefferson County, and Jefferson County Commission.
Carl Johnson and Whit Colvin of Bishop, Colvin, Johnson & Kent, Birmingham, for intervenor Jefferson County Board of Education.
Kenneth L. Thomas and Afrika C. Parchman of Thomas, Means, Gillis & Seay, P.C., Birmingham, for intervenor Birmingham Board of Education.
William M. Slaughter, J. Vernon Patrick, Mark E. Ezell, Mark D. Hess, and Michael K.K. Choy of Haskell, Slaughter, Young & Rediker, LLC, Birmingham; and E.A. Strickland and Jeffrey M. Sewell of Jefferson County Law Department for appellees (on rehearing) Jefferson County, Travis A. Hulsey, as revenue director of Jefferson County, and Jefferson County Commission.
SEE, Justice.[1]
Paul E. Chism, on behalf of a class of taxpayers and citizens of Jefferson County, appeals the trial court's summary judgment in favor of Jefferson County, which, in effect, validated a warrant issue and the related tax levy. We affirm.

Facts and Procedural History
In 2004, the Jefferson County Commission ("the Commission") determined that the Jefferson County Board of Education and the municipal school boards in Jefferson County had current capital needs in excess of $1 billion. The Commission set *1061 out to implement a plan of financing that would provide each local school board in Jefferson County with its proportionate share of $1 billion for the acquisition and construction of currently needed capital projects or the retirement of debt the board had already incurred to finance such projects. On August 24, 2004, the Commission adopted ordinance no. 1764, which levied additional county-wide taxes and pledged those taxes to fund new warrants to be issued by Jefferson County. The net proceeds from the sale of the warrants would be used for capital improvements of the public schools in Jefferson County.
On November 23, 2004, Paul E. Chism and others ("the Chism plaintiffs") sued Jefferson County and its revenue director, Travis A. Hulsey, challenging the validity of ordinance no. 1764. On December 16, 2004, the Commission repealed ordinance no. 1764 and adopted, in its place, ordinance no. 1769. Ordinance no. 1769 levied a county-wide privilege or license tax and a county-wide excise tax ("the education taxes"),[2] beginning January 1, 2005, and pledged the revenues from the education taxes to fund warrants to be issued by Jefferson County, the net proceeds of which would be used for capital improvements of the public schools in Jefferson County ("the education warrants").
The County thereafter answered the Chism plaintiffs' complaint, pointing out that ordinance no. 1764 had been repealed and replaced with ordinance no. 1769. The Chism plaintiffs then amended their complaint to challenge ordinance no. 1769. The trial court ordered that the case would proceed as a class action on behalf of all taxpayers and citizens of Jefferson County.

The Education Warrants
On December 29, 2004, Jefferson County issued the first series of the education warrants, entitled "Limited Obligation School Warrants, Series 2004-A," in the aggregate principal amount of $650,000,000. The Series 2004-A warrants have maturity dates from January 2007 to January 2025 and bear fixed annual interest at rates ranging from 4.75% to 5.5%. On February 2, 2005, Jefferson County completed the issuance of the series of the education warrants by issuing "Limited Obligation School Warrants, Series 2005-A and 2005-B Warrants," in the aggregate principal amount of $400,000,000. The Series 2005-A and 2005-B warrants have maturity dates from January 2007 to January 2027 and bear interest at variable rates.[3]
Jefferson County has obtained the agreement of each local school board to use the proceeds of the education warrants solely for the acquisition or improvement of school buildings and/or the acquisition of capital equipment or, alternatively, for the retirement of debt previously incurred for *1062 such purposes.[4] The State superintendent of education has also reviewed and approved the consents of the local school boards in connection with his approval of the issuance of the education warrants.[5]
To facilitate the financing plan, the Commission entered into a trust indenture with SouthTrust Bank (now Wachovia Bank). The trust indenture provides that all proceeds realized from the sale of the education warrants (less the costs of issuing the warrants) are to be deposited into a special fund ("the grant fund") pending distribution of those proceeds to the local school boards.[6]
By their terms, the education warrants do not represent "general obligations of the county backed by its full faith and credit," but are "limited obligations" of the County payable solely from the revenues collected under the education taxes. However, in Section 9.1 of the trust indenture, the County has pledged its full faith and credit to pay from its general fund any deficit in the event of an extraordinary mandatory redemption of the education warrants. This extraordinary mandatory redemption will occur if Jefferson County cannot certify on or before October 20, 2006, that no litigation is pending challenging the validity of the education warrants.
If, however, by October 20, 2006, Jefferson County can certify that no litigation challenging the validity of the education warrants is pending, the proceeds of the education warrants remaining in the grant fund will be paid, upon the request of an "authorized county representative," in the form of grants to the following local school boards within Jefferson County: Bessemer, Birmingham, Fairfield, Homewood, Hoover, Jefferson County, Leeds, Midfield, Mountain Brook, Tarrant, and Vestavia Hills, to be used by those boards for the construction or capital improvement of schools or to retire preexisting debt of the boards incurred for capital-improvement projects. The 11 school boards are each to receive a proportionate share of the balance in the grant fund based on the board's "Foundation Program" cost for the 2004-2005 school year, which was based on student attendance/enrollment during the fall of 2003. See Ala.Code 1975, § 16-13-230 et seq. (establishing the Foundation Program Fund).

The Education Taxes
Jefferson County purports to have authority to levy the education taxes pursuant *1063 to Ala.Code 1975, § 40-12-4, "County license tax for school purposesAuthority to levy." The education taxes have been collected since January 1, 2005, and are being deposited into a special escrow account at Wachovia Bank (as successor to SouthTrust) pending the outcome of this litigation. The Chism plaintiffs say that, if the pledge of the education taxes or the education warrants are invalidated, the funds in this escrow account will be distributed to the local school boards according to their respective annual Foundation Program costs. In that event, the County will also repeal the education taxes in their entirety. If the education warrants and the tax pledge are validated, however, the funds and future tax collections will be used to pay debt service on the education warrants.[7]

Disposition in the Trial Court
Both the Chism plaintiffs and Jefferson County moved for a summary judgment in their favor. The trial court entered a summary judgment in favor of Jefferson County, upholding the validity of ordinance no. 1769 and, in effect, the education warrants and the education taxes. The Chism plaintiffs moved to alter, amend, or vacate the trial court's order entering a summary judgment for Jefferson County; the trial court denied that motion. The Chism plaintiffs appeal.

Analysis
The Chism plaintiffs first argue that the issuance of the education warrants and the pledge of the education taxes to their repayment constitute debt chargeable against Jefferson County's constitutional debt limit and thus that the issuance of the education warrants will cause Jefferson County to exceed its constitutionally imposed debt limit. "`A court has a duty to avoid constitutional questions unless essential to the proper disposition of the case.'" Lowe v. Fulford, 442 So.2d 29, 33 (Ala.1983) (quoting trial court's order citing Doughty v. Tarwater, 261 Ala. 263, 73 So.2d 540 (1954); Moses v. Tarwater, 257 Ala. 361, 58 So.2d 757 (1952); and Lee v. Macon County Bd. of Educ., 231 F.Supp. 743 (M.D.Ala.1964)). "`Generally courts are reluctant to reach constitutional questions, and should not do so, if the merits of the case can be settled on non-constitutional grounds.'" Lowe, 442 So.2d at 33 (quoting trial court's order citing White v. U.S. Pipe & Foundry Co., 646 F.2d 203 (5th Cir.1981)). "`No matter how much the parties may desire adjudication of important questions of constitutional law, broad considerations of the appropriate exercise of judicial power prevent[] such determinations unless actually compelled by the litigation before the court.'" Lowe, 442 So.2d at 33 (quoting trial court's order citing Troy State Univ. v. Dickey, 402 F.2d 515 (5th Cir.1968)). Thus, before addressing the constitutional-debt-limit issue, we will consider the two other substantive issues that the Chism plaintiffs raise: (1) *1064 whether the proceeds from the education taxes must be distributed to the local school boards based on their respective annual Foundation Program costs or whether Jefferson County may use the proceeds of the education taxes to service the debt on the education warrants, and (2) whether Jefferson County has the statutory authority to issue the education warrants.

I.
Jefferson County is authorized by § 40-12-4, Ala.Code 1975, to levy the education taxes imposed by ordinance no. 1769. Section 40-12-4 states, in pertinent part:
"(a) In order to provide funds for public school purposes, the governing body of each of the several counties in this state is hereby authorized by ordinance to levy and provide for the assessment and collection of franchise, excise and privilege license taxes with respect to privileges or receipts from privileges exercised in such county, which shall be in addition to any and all other county taxes heretofore or hereafter authorized by law in such county. . . . All the proceeds from any tax levied pursuant to this section less the cost of collection thereof shall be used exclusively for public school purposes, including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor.
"(b) . . . In all counties having more than one local board of education, revenues collected under the provisions of this section shall be distributed within such county on the same basis of the total calculated costs for the Foundation Program for those local boards of education within the county."
The Chism plaintiffs do not challenge the authority of Jefferson County to levy the education taxes, nor do they contend that the taxes are not levied exclusively for public-school purposes or that the taxes otherwise fail to comply with the requirements imposed by § 40-12-4, Ala.Code 1975. Thus, we are not asked to address the legality of the education taxes. Instead, the Chism plaintiffs challenge Jefferson County's method of distributing the revenues of the education taxes collected under ordinance no. 1769. They argue that under the plan described in ordinance no. 1769 the revenues will not be distributed in accordance with the language of § 40-12-4(b), which requires that the tax revenues "be distributed within such county on the same basis of the total calculated costs for the Foundation Program for those local boards of education within the county."
The Chism plaintiffs argue that § 40-12-4 requires that the education taxes be distributed directly to the local school boards annually, and the distribution must be based on the local boards' Foundation Program costs for the year preceding the year in which the tax revenues are collected.[8] They explain that, under the Foundation Program, State funds are distributed to the local school boards, and the amount distributed to a local board in a given year depends primarily on student enrollment during the first 40 days of the preceding school year. The Chism plaintiffs infer from this that Foundation Program funds are distributed on an annual basis; Jefferson County does not dispute this contention.
*1065 Jefferson County sold the education warrants and received the proceeds from their sale in late 2004 (Series 2004-A) and early 2005 (Series 2005-A and 2005-B). The net proceeds are presently in the grant fund. Ordinance no. 1769 provides that the revenues from the education taxes will service the debt on the education warrants, which generated the funds presently in the grant fund. The 11 local school boards are to receive a proportionate share of the balance in the grant fund based on each board's Foundation Program cost for the 2004-2005 school year, which was based on student attendance/enrollment as it was measured during the fall of 2003.
The Chism plaintiffs argue that the revenues from the education taxes cannot be used in this way even though the proceeds of the education warrants will benefit the local school boards, because, they say, the proceeds of the education warrants will be distributed on a basis different from the manner in which the tax revenues would have been distributed under the formula in the Foundation Program. The Chism plaintiffs explain their argument by way of example as follows: the plan of distribution under ordinance no. 1769 is "frozen on a snapshot of student enrollments in 2003," which means that "the taxes collected, say in 2010, will not be distributed based on the systems' respective needs as reflected by their then most-recent student populations, but, instead, those taxes will be used to pay warrants that generated funds in 2005 that will be distributed to the various school systems based on student enrollments in 2003." Chism plaintiffs' brief, pp. 64-65.
The Chism plaintiffs argue that the provision in Ala.Code 1975, § 40-12-4(a), allowing the use of the revenues from the education taxes for "the payment of debt service" and the § 40-12-4(b) requirement that "revenues . . . shall be distributed . . . on the same basis of the total calculated costs for the Foundation Program," can be read together to mean that the local school boards may themselves issue warrants and service those warrants by the tax proceeds received by them from the counties pursuant to § 40-12-4 according to their Foundation Program costs.
The Chism plaintiffs also contend that it is permissible under § 40-12-4 for a county that does not have more than one local board to issue warrants and service the debt created with the tax revenues collected under § 40-12-4; for a county with only one local school board, the Foundation Program reference in § 40-12-4(b) does not come into play.[9] They contend, however, that a county, such as Jefferson County, with more than one local school *1066 board cannot pledge taxes levied under § 40-12-4 to service debt on warrants because a county with more than one local school board must distribute annually the tax revenues directly to the local boards.[10]
Jefferson County does not disagree with the Chism plaintiffs that, to some extent, Ala.Code 1975, § 40-12-4, by its reference to the Foundation Program, contemplates annual and direct distribution of the funds to the local school boards. They disagree, however, as to whether a county with more than one local school board may pledge taxes levied under § 40-12-4 to service debt on a warrant issue that benefits the local boards in lieu of making direct annual distributions of the tax revenues to the local school boards. Jefferson County urges the following interpretation of § 40-12-4:
"(i) [A]ny portion of the tax proceeds being paid directly to the school boards should be allocated in proportion to annual recalculations of their respective Foundation Program costs, and (ii) any portion of the tax proceeds committed to debt service for warrant issues having maturities greater than one year should be allocated on the basis of the shares of the cumulative debt services respectively allocated to the school boards, which shares are based on the allotments of warrant proceeds made the fiscal year of warrant issuance."
Jefferson County's brief, p. 77.[11]
"[A]n ordinance enacted by a local governing body `is presumed reasonable and valid, and . . . the burden is on the one challenging the ordinance to clearly show its invalidity.'" Brown v. Board of Educ. of Montgomery, 863 So.2d 73, 75 (Ala.2003) (quoting Jefferson County v. Richards, 805 So.2d 690, 706 (Ala.2001)).[12] *1067 We are compelled to agree with the trial court that the Chism plaintiffs have not met this burden.
The Chism plaintiffs interpret the reference in § 40-12-4(b) to the Foundation Program as a limitation on the provision in § 40-12-4(a) that taxes levied under that Code section may be used as debt service, but that the limitation affects only counties with more than one local board of education. They read that reference as a proviso. "Provisos serve the purpose of restricting the operative effect of statutory language to less than what its scope of operation would be otherwise." 2A Norman J. Singer, Statutes and Statutory Construction § 47.08 (6th ed.2000).
"`[Provisos] are construed using the same general criteria of decision applied to other kinds of provisions. However, where there is doubt concerning the extent of the application of the proviso on the scope of another provision's operation, the proviso is strictly construed. The reason for this is that the legislative purpose set forth in the purview of an enactment is assumed to express the legislative policy, and only those subjects expressly exempted by the proviso should be freed from the operation of the statute.'"
Pace v. Armstrong World Indus., Inc., 578 So.2d 281, 284 (Ala.1991) (quoting Sutherland Statutory Construction, § 47.08 (4th ed.)). Having considered the language of Ala.Code 1975, § 40-12-4, as well as its history, we conclude that it is at least doubtful whether the reference in § 40-12-4(b) to the Foundation Program Fund limits the provision in § 40-12-4(a) allowing § 40-12-4 taxes to be used to service debt.
The plain language of § 40-12-4 does not clearly indicate that as it applies to Jefferson County the reference to the Foundation Program limits the authorization to pledge the § 40-12-4 taxes to service debt.[13] The Chism plaintiffs read into § 40-12-4 a requirement that the taxes collected be distributed directly to the local school boards, even if the local boards have agreed to accept their respective shares of the taxes in the form of debt service on warrants the proceeds of which benefit those local boards.[14]
The Chism plaintiffs also read into § 40-12-4 a requirement that the authorized taxes must be distributed to the local school boards annually, according to the Foundation Program costs for the preceding school year. The two premises on which the Chism plaintiffs' argument reststhat the revenues from the taxes must be distributed directly to the local school boards and that they must then be distributed to the local school boards in proportion to their annual Foundation Program costs of the year preceding the year in which the revenues are received by the countyare not found in the plain language of the statute. "We will not read into a statute what the Legislature has not written." Elmore County Comm'n v. Smith, 786 So.2d 449, 455 (Ala.2000).
The history of Ala.Code 1975, § 40-12-4, does not clearly indicate that the reference to the Foundation Program in that section should limit Jefferson County's authority *1068 to pledge the taxes to service debt incurred for purposes of capital improvements for education. Section 40-12-4 was enacted in 1969. Act No. 34, Ala. Acts 1969 (Spec. Session). Act No. 34 provided, in pertinent part, in § 1:
"In order to provide funds for the operation of the public schools in the county, the governing body of each of the several counties in this state is hereby authorized by ordinance or resolution to levy and provide for the assessment and collection of franchise, excise and privilege license taxes, which shall be in addition to any and all other county taxes heretofore or hereafter authorized by law, in such county. . . . All the proceeds from any tax levied pursuant to this Act less the cost of collection thereof shall be used exclusively for public school purposes. Provided that in all counties having more than one (1) school system, revenues collected under the provisions of this Act shall be distributed within such county on the same basis as funds received by the county from the Minimum Program Fund are distributed within the county."
Thus, Ala.Code 1975, § 40-12-4, as originally enacted by the legislature did not include a provision allowing the taxes it authorized to be levied to be used to service debt.[15]
The Minimum Program Fund to which § 40-12-4 as originally enacted referred is the predecessor to the Foundation Program Fund. The Minimum Program Fund was established in 1935 to provide "a minimum school term" and "the equalization of educational opportunity." Ala.Code 1940, Tit. 52, §§ 208-215. Title 52, § 209, indicates that amounts from the Minimum Program Fund were paid to local school boards annually. ("Each county board of education shall receive from the minimum program fund during any single year, an amount which is at least equivalent to the amount received by that county board of education and by the boards of each of the independent cities within the county during the fiscal year beginning October 1, 1934, and ending September 30, 1935, from [certain listed] funds. . . . ").
In 1988, while the Minimum Program Fund was still in place, the legislature passed Act No. 88-336, Ala. Acts 1988, which amended § 40-12-4 to provide that the proceeds from taxes levied under § 40-12-4 "may be used for any public school purpose in such county, including capital improvements and the payment of debt service on obligations issued therefor." Title to Act No. 88-336. Thus, § 40-12-4 was amended to read: "[A]ll of the proceeds from any tax levied pursuant to this section less the cost of collection thereof shall be used exclusively for school purposes, including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor." (Added language emphasized.)
When the legislature amended § 40-12-4 to allow the taxes levied pursuant to that Code section to be used for debt service, the legislature knew that annual allocations under the Minimum Program Fund were being made to local school boards. Yet the legislature expressly approved the use of the tax for debt service, which would involve an "up front" distribution of funds generated from the creation of the debt and the later use of the tax revenues to service that debt.
When the legislature, in Act No. 88-336, approved the use of taxes levied under § 40-12-4 to service debt, the legislature *1069 included a section in that Act that was codified as § 40-12-4.1 and that reads:
"It is the intent of the Legislature by the passage of Acts 1988, No. 88-336, to clarify existing provisions of law respecting the use of the proceeds from the taxes authorized to be levied in the aforesaid Section 40-12-4. To that end, the amendment of said Section 40-12-4 effected by Section 1 of this Act shall be deemed declarative of existing law and shall therefore have both a prospective and a retroactive or retrospective operation. Without limiting the generality of the foregoing, the proceeds from any taxes heretofore levied pursuant to the provision of said Section 40-12-4 may be used for any purpose specified in said section, as amended hereby."
Section 40-12-4.1 emphasizes the legislature's intent that taxes levied under § 40-12-4 be available to service debt incurred for any public-school purpose.
The plain language of the statute and its history indicate that it is doubtful that the reference in § 40-12-4(b) to the Foundation Program limits Jefferson County's ability to use the taxes levied under subsection (a) to service debt. Therefore, we must construe that proviso strictly and in deference to the legislature's purpose in enacting § 40-12-4(a) and § 40-12-4.1  to authorize the levy of taxes to provide funds for public-school purposes and to provide that taxes levied under § 40-12-4(a) may be used to service debt. See Pace, 578 So.2d at 284.
We next consider the legislative intent behind § 40-12-4. Alabama Code 1975, § 40-12-4(a), expressly states that taxes levied under § 40-12-4(a) are to "be used exclusively for public school purposes, including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor." It is clear that the legislature's purpose in allowing for taxes levied under § 40-12-4 to be used to service debt is to benefit public schools in a way that the expenditure of the tax revenues in the year received might not. The Chism plaintiffs have not convinced us that this benefit should be denied to Jefferson County and its local school boards[16] simply because Jefferson County has more than one local school board.
In addition, § 40-12-4 is ambiguous as applied in this case.
"`This Court has held that the fundamental rule of statutory construction is to ascertain and give effect to the intent of the Legislature in enacting a statute. If possible, a court should gather the legislative intent from the language of the statute itself. If the statute is ambiguous or uncertain, the court may consider conditions that might arise under the provisions of the statute and examine results that would flow from giving the language in question one particular meaning rather than another. The legislative intent may be gleaned from the language used, the reason and necessity *1070 for the act, and the purpose sought to be obtained by its passage.'"
Holcomb v. Carraway, 945 So.2d 1009, 1018 (Ala.2006) (quoting Norfolk Southern Ry. v. Johnson, 740 So.2d 392, 396 (Ala. 1999)) (citations omitted).
The parties agree that the principal intent of the legislature in referencing the Foundation Program in § 40-12-4 was to assure that the proceeds of a county-wide tax would be distributed in proportion to the student head count in the territorial jurisdictions of the respective local school boards. Jefferson County's plan accomplishes that objective. The benefits made possible by the tax revenues are distributed to the local school boards on a basis that takes into account the Foundation Program costs. The benefits of the levy of the education taxes will undoubtedly be felt from the time the grants are made from the proceeds of the education warrants well into the futurelikely beyond the period of the tax levy. Indeed, that is true of any moneys spent on capital improvementswhether those moneys come from the proceeds of the sale of warrants or from tax revenues.[17] The Chism plaintiffs have not persuaded us that the benefits must be in the form of tax revenues directly distributed to a local school board in the year after its receipt.
We recognize, as the Chism plaintiffs argue, that ordinance no. 1769 makes no provision for local school boards that might be created after the effective date of the ordinance. Justice Bolin argues that, therefore, "there is great potential that taxpaying citizens of a newly created system will have children attending school in a system that receives no benefit from the indebtedness created pursuant to this ordinance." 954 So.2d at 1089-90. This is a strong policy argument against a financing arrangement like the one Jefferson County implemented here. However, that policy argument has equal force against a financing arrangement that both parties agree is permissible under § 40-12-4, namely, an arrangement in which a county with only one school district levies a tax under § 40-12-4 and pledges that tax to pay for warrants that benefit the then existing local school board.[18] The same deterrent to forming a new school district that Justice Bolin identifies in Jefferson County's arrangement here exists in a county with only one local school board. Yet the Chism plaintiffs concede that it is the legislative plan not to require counties with only one local school board to comply with the § 40-12-4(b) distribution requirement. The legislature cannot reasonably be believed to hold two contradictory policies in mind at one time. See, e.g., Saxon v. Lloyd's of London, 646 So.2d 631, 635 (Ala. 1994) ("`There is a strong presumption that the Legislature does not intend to contradict in one paragraph of a legislative act that which it has deliberately declared in another. Hence the familiar rule of construction which imputes to an apparently or possibly contradictory paragraph any rational meaning which will avoid its seeming contradiction of another paragraph whose meaning is clear and certain.'" (quoting Blumberg Shoe Co. v. Phoenix Assurance Co., 203 Ala. 551, 554, 84 So. 763, 766 (1919))). Justice Bolin's policy argument against ordinance no. 1769 is a compelling one, but it is one that *1071 "`should be directed to the legislature, not to this Court.'" Munnerlyn v. Alabama Dep't of Corr., 946 So.2d 436, 440 (Ala. 2006) (quoting DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 277 (Ala.1998)). See also Pitts v. Gangi, 896 So.2d 433, 436 (Ala.2004) ("There is clearly a `rational' way to view the words of the Legislature. It may not reflect a policy that the members of this Court would adopt, but that is an entirely different matter. If the Legislature intends this statute to be applied in a different manner, the Legislature may correct the statute in its own way and its own time."); Simcala, Inc. v. American Coal Trade, Inc., 821 So.2d 197, 203 (Ala.2001) ("If adverse effects on market conditions warrant a different result [than that demanded by a `plain meaning' interpretation,] it is for the Legislature, not this Court, to amend the statute."); and Folmar & Assocs. LLP v. Holberg, 776 So.2d 112, 118 (Ala.2000) ("While there may be valid policy arguments for extending the Act . . . `it is not for the Judiciary to impose its view on the Legislature.'" (quoting Ex parte T.B., 698 So.2d 127, 130 (Ala.1997))). Justice Bolin's policy argument is not a basis on which to substitute a statute this Court would have passed for the one the legislature did pass.[19]
We must presume that ordinance no. 1769 is reasonable and valid. The burden rests on the Chism plaintiffs to overcome that presumption. They have not done so. The Chism plaintiffs argue that ordinance no. 1769 is not authorized by § 40-12-4. However, the proviso upon which the Chism plaintiffs rely does not clearly limit the legislature's grant of authority, and provisos are to be construed narrowly. In addition, § 40-12-4, as it applies to this case, is ambiguous, requiring us to look to the legislature's intention. We conclude that Jefferson County's financing plan is not contrary to that intention; therefore, we cannot agree with the Chism plaintiffs that ordinance no. 1769 is invalid.

II.
Jefferson County relies upon Ala.Code 1975, § 11-28-1 et seq., as its authority for issuing the education warrants. Section 11-28-1, entitled "Legislative intent," provides:
"It is the intention of the legislature by the passage of this chapter to authorize each county in the state of Alabama: (i) to sell and issue warrants for the purpose of financing the costs of acquiring, by construction, purchase or otherwise, any public facilities described in section 11-28-1.1 that such county may be lawfully authorized to acquire at the time of the issuance of such warrants and (ii) to sell and issue warrants for the purpose of refunding any bonds, notes, warrants or other instruments evidencing valid debt at any time incurred or assumed by such county to pay the costs of acquiring such public facilities or to refund debt that, through one or more prior refundings, had been initially incurred for the payment of such costs, it being the intention of this chapter that *1072 any debt of such county may be refunded by warrants issued under this chapter irrespective of whether such debt was initially incurred under this chapter or under other provisions of law, whether such debt constituted a general obligation of such county or was a limited obligation payable solely from one or more specified sources, whether such debt was initially incurred by such county or was initially incurred by another public body and thereafter assumed by such county, and whether such debt was incurred or assumed by such county before or after December 21, 1983. This chapter shall be liberally construed in conformity with the intention expressed in the preceding sentence; provided, however, that nothing contained in this chapter shall be construed to give any county new or increased authority to acquire any public facility described in section 11-28-1.1 beyond the authority with respect to such public facility which such county may have pursuant to laws other than this chapter."
Alabama Code 1975, § 11-28-1.1(5), defines "public facilities" as follows:
"When used with reference to or in connection with any county, [`public facilities'] mean any or all of the following facilities which such county may at any time have been or be authorized to acquire, by construction, purchase or otherwise, pursuant to any laws other than this chapter, including all land and all easements and other rights or interests in land necessary or desirable for such facilities:
"a. All courthouses, jails, hospitals, office buildings, school buildings, libraries, storage facilities, parking structures, equipment repair facilities and other buildings and structures of every kind needed for the performance of governmental functions and responsibilities of such county. . . . "
Section 11-28-2, entitled "Authorization of issuance of warrants," provides:
"In addition to all other warrants which any county shall have the power to issue pursuant to laws other than this chapter, the county shall have the power from time to time to sell and issue warrants of the county for the purpose of paying costs of public facilities. . . . The proceeds derived from the sale of the warrants shall be used solely for the purpose for which they are authorized to be issued."
The Chism plaintiffs complain that "[n]one of the proceeds of the [education] warrants will be used by it in acquiring any facilities, or in enlarging or improving any facilities owned or formerly owned by Jefferson County, or in refunding any obligations of Jefferson County." Chism plaintiffs' brief, p. 49. Instead, the proceeds of the education warrants will be used to provide grants to local school boards in Jefferson County so that the local boards can acquire school buildings that will be owned by those boards.[20] The *1073 Chism plaintiffs contend that this use of the proceeds of the education warrants is not authorized by Ala.Code 1975, § 11-28-1 et seq. The Chism plaintiffs also contend that the school buildings to be acquired with the proceeds of the education warrants are not "needed for the performance of governmental functions and responsibilities of" Jefferson County, § 11-28-1.1, and thus that the proceeds of the education warrants cannot be used to acquire the school buildings.
Alabama counties are creatures of statute and therefore "`can exercise only that authority conferred on [them] by [the Legislature].'" Dillard v. Baldwin County Comm'n, 833 So.2d 11, 16 (Ala. 2002) (quoting Jefferson County v. Johnson, 333 So.2d 143, 145 (Ala.1976), and citing Laney v. Jefferson County, 249 Ala. 612, 32 So.2d 542 (1947), and Askew v. Hale County, 54 Ala. 639 (1875)). As a corollary, county commissions are "`creatures of the Legislature,'" having "`no inherent powers.'" Dillard, 833 So.2d at 16 (quoting Arledge v. Chilton County, 237 Ala. 96, 99, 185 So. 419, 421 (1938), and 4 Chester James Antieau, Antieau's Local Government Law: County Law § 32.03 (1989)). "Thus they `can exercise only such powers as are expressly given them by statute, or such as arise by necessary implication from the powers granted, or are indispensable to carry into effect the object and purpose of their creation.'" Dillard, 833 So.2d at 16 (quoting Antieau and citing Corning v. Patton, 236 Ala. 354, 356, 182 So. 39, 40 (1938)). "`[E]nactments conferring power upon county governing boards will be strictly and narrowly construed. In case of reasonable doubt as to the existence of board power, courts will customarily resolve the doubt against the county board.'" Dillard, 833 So.2d at 16 (quoting 4 Antieau, supra, at § 32.03). "`But the courts must not defeat the legislative intent or defeat powers expressly granted or necessarily implied by a strict construction.'" Southern Ry. v. Cherokee County, 144 Ala. 579, 581, 42 So. 66, 66 (1905) (quoting 27 Am. & Eng. Ency. Law, 870(2), n. 4 and 5). With these principles in mind, we review the Chism plaintiffs' arguments.

A.
We first address the Chism plaintiffs' argument that the school buildings that will be acquired with the proceeds of the education warrants are not "public facilities" as that term is defined in Ala.Code 1975, § 11-28-1.1(5). "Public facilities" are defined, in pertinent part, as
"school buildings, libraries, storage facilities, parking structures, equipment repair facilities and other buildings and structures of every kind needed for the performance of governmental functions and responsibilities of such county. . . . "
The Chism plaintiffs contend that the phrase "needed for the performance of governmental functions and responsibilities of such county" modifies the term "school buildings." The Chism plaintiffs contend that Jefferson County "has no governmental function or responsibilities with respect to" the school buildings that will be acquired with the proceeds from the grant fund and, thus, cannot acquire such buildings.
Jefferson County contends, on the other hand, that the phrase "needed for the performance of governmental functions and responsibilities of such county," as interpreted by the Chism plaintiffs, cannot *1074 modify "school buildings." Jefferson County says it would have been "illogical and fruitless" for the legislature to expressly include "school buildings" in the list of public facilities a county may acquire with warrant proceeds and then to negate that authority with a provision that excludes school buildings because, as the legislature well knew, the public schools are operated by a state system of local school boards rather than by the counties. We agree with Jefferson County.
The Chism plaintiffs cite several statutes that indicate that the legislature was aware when it enacted § 11-28-1.1 that public schools are operated by local school boards. See, e.g., Ala.Code 1975, § 16-11-2 (vesting "[t]he general administration and supervision of the public schools and educational interest of each city" in "a city board of education"); § 16-11-9 (vesting the city board of education "with all the powers necessary or proper for the administration and management of the free public schools within such city. . . ."); § 16-11-11 ("All property real, personal and mixed now held or hereafter acquired for school purposes shall be held in trust by the city board of education for the use of the public schools of the city."); § 16-8-8 ("The general administration and supervision of the public schools of the educational interests of each county, with the exception of cities having a city board of education, shall be vested in the county board of education. . . ."); and § 16-8-9 ("The county board of education shall exercise . . . control and supervision of the public school system of the county.").
"[I]t is presumed that the legislature does not enact meaningless, vain or futile statutes." Druid City Hosp. Bd. v. Epperson, 378 So.2d 696, 699 (Ala.1979) (citing Adams v. Mathis, 350 So.2d 381 (Ala.1977)). Thus, we cannot agree with the Chism plaintiffs that "public facilities" as used in § 11-28-1.1 does not include a "school building" that might not be owned by the county issuing the warrants.

B.
The Chism plaintiffs argue that Jefferson County must ultimately own the school buildings that are to be acquired with the proceeds of the education warrants. The Chism plaintiffs infer from the legislature's recurring use of the word "acquire" in § 11-28-1 that Jefferson County must own the facilities ultimately acquired with the proceeds of the education warrants. We are not so persuaded. The Chism plaintiffs provide no authority that indicates that any particular meaning should be attached to the frequency of a word's appearance in a statute. Moreover, the Chism plaintiffs provide us with no indication that the use of the word "acquire" necessarily means "acquire for oneself" and cannot mean "acquire for another." Nor does the context in which the word "acquire" appears in § 11-28-1 et seq. indicate that Jefferson County must come to own the public facilities it "acquires."
The Chism plaintiffs point to the title of Act No. 83-921, Ala. Acts 1983, the Act that was codified as § 11-28-1. The title states that the purpose of Act No. 83-921 is
"to authorize each county in the State of Alabama to sell and issue from time to time warrants for the purpose of paying the costs of acquiring (by construction, purchase or otherwise) public facilities which such county is authorized to acquire by laws other than this act. . . . "
The Chism plaintiffs contend that the title of Act No. 83-921 "discloses only that such warrants may be issued in connection with the acquisition by the county of public facilities." Chism plaintiffs' brief, p. 51 (emphasis added). However, the title sheds no further light on the question *1075 before us than does the language of the statute itself, which provides that the legislature's intention is
"to authorize each county in the state of Alabama: (i) to sell and issue warrants for the purpose of financing the costs of acquiring, by construction, purchase or otherwise, any public facilities described in section 11-28-1.1 that such county may be lawfully authorized to acquire at the time of the issuance of such warrants. . . . "
Act No. 83-921, on the title of which the Chism plaintiffs rely, was enacted in the fourth special session of the legislature in 1983. Jefferson County points out that the initial version of the statute, Act No. 83-75, Ala. Acts 1983, enacted in the first special session of the legislature in 1983, provided for the issuance of warrants by a county
"for the purpose of paying costs to that county of erecting necessary public buildings, bridges and roads in such county and acquiring land therefor."
(Emphasis added.) Jefferson County contends that "[e]vidently, the legislature determined that its first effort was an inadequate provision for authorization of county warrants" and that it thus later passed a "more comprehensive" warrant statute the current statute. That the legislature, in a previous version of the statute, had stated that the warrants should be used to pay the cost "to that county" of acquiring public facilities may indicate that the legislature, at that time, contemplated that the cost would be incurred by the county and, therefore, may indicate that the legislature envisioned that the county issuing the warrants would own the facility. However, the legislature chose to omit that clause from the version of the act codified as the current statute.
The Chism plaintiffs have directed us to no language in Ala.Code 1975, § 11-28-1 et seq., that would require Jefferson County to ultimately own the public facilities that are acquired with the proceeds from the education warrants. Nor does the history of the statute appear to support the Chism plaintiffs' argument. We recognize that Jefferson County has only the authority conferred upon it, or necessarily implied, by a statute. However, we are not to construe a statute so strictly as to "defeat the legislative intent or defeat powers expressly granted or necessarily implied by a strict construction." Southern Ry. v. Cherokee County, 144 Ala. at 581, 42 So. at 66.
When a statute is ambiguous, we consider the legislative intent in enacting it. Our consideration of the parties' arguments regarding the language of § 11-28-1 has led us to conclude that, as applied in this case, the statute is ambiguous. Therefore, we again look at the legislature's intent in enacting the statute.
It is undisputed that the legislature expressly granted counties the authority to issue warrants to acquire (for at least some entity) certain public facilities. We have concluded above that under § 11-28-1 a "school building" is one of the types of public facilities a county may acquire (for at least some entity) with warrant proceeds. For much the same reason we reached that conclusion, we also conclude that Jefferson County does not need ultimately to own the school buildings acquired with the proceeds of the education warrants. It seems clear that, in authorizing counties to issue warrants to acquire school buildings, the legislature was well aware that local school boards operate the school systems. Accordingly, Jefferson County argues that a rational interpretation of the statute is that a county is authorized to acquire public facilities not only for itself, but also for the general benefit of the public that it serves. We *1076 conclude that this interpretation is consistent with the legislature's intent in allowing the issuance of county warrants to acquire facilities to be used for public schools. Thus, we hold that the trial court did not err in concluding that the education warrants are authorized by Ala. Code 1975, § 11-28-1 et seq.

III.
Having concluded that Jefferson County does not lack the statutory authority to issue the education warrants or to distribute the revenues from the education taxes as set forth in ordinance no. 1769, we now turn to consider the constitutional issue the Chism plaintiffs raise: whether the issuance of the education warrants and the pledge of the proceeds from the education taxes to their payment has caused Jefferson County to exceed its constitutionally imposed debt limit.[21]

A.
Section 224, Ala. Const.1901, imposes a limitation on the debt a county may incur:[22]
"No county shall become indebted in an amount including present indebtedness, greater than five percentum of the assessed value of the property therein. Nothing herein contained shall prevent any county from issuing bonds, or other obligations, to fund or refund any indebtedness now existing or authorized by existing laws to be created."
Justice Parker's dissent makes much of the plain meaning of the words "debt" and "indebted." We can accept for purposes of this case that the word "debt" encompasses any obligation;[23] however, we still must *1077 address whether it is in substance and reality an obligation against Jefferson County's constitutional debt limit.[24] That is, do the holders of education warrants have a claim against Jefferson County? It is undisputed that, if the principal amount of the education warrants constitutes additional indebtedness of Jefferson County under § 224, Jefferson County has exceeded its constitutional debt limit. What is at issue here is whether Jefferson County has assumed additional debt. The Chism plaintiffs argue that the issuance of the education warrants and the pledge of the proceeds of the education taxes to their repayment constitute debt of Jefferson County that is chargeable against Jefferson County's constitutional debt limit. Jefferson County, however, argues that the education warrants are not chargeable to Jefferson County's constitutional debt limit because they are serviced by a completely new revenue sourcethe education taxesthat is not otherwise available to fund the County's general governmental purposes. If the revenue from the education taxes is not available to Jefferson County for general governmental purposes and Jefferson County has no obligation to make any payments on the education warrants out of any of the general revenues that are available to it, then the education warrants are not a debt of Jefferson County to be charged against its constitutional debt limit.[25]
Jefferson County states that, in undertaking to issue the education warrants, it relied upon Taxpayers & Citizens of Shelby County v. Acker, 641 So.2d 259 (Ala. 1994), which, Jefferson County contends, "unequivocally sustains the County's right to pledge the Education Taxes without causing the Education Warrants to count against the County's debt limit."
In Acker, the Shelby County Commission issued "limited obligation refunding warrants," pursuant to Ala.Code 1975, *1078 § 11-28-2,[26] in a principal amount of $30 million for the purpose of refunding previously issued courthouse warrants, sewer warrants, and Series 1990-B warrants in advance of their respective maturities.[27] Shelby County also levied a special sales tax and pledged the proceeds of the special sales tax to pay only "indebtedness of the County that existed on the effective date of the act providing for the special tax." 641 So.2d at 260. The warrant resolution provided that the indebtedness evidenced by the warrants "shall be a limited obligation of the County payable solely from, and secured by a pledge of, the proceeds of the special tax." 641 So.2d at 260. The trial court concluded that the warrants did not constitute a debt of Shelby County under § 224. Taxpayers and citizens of Shelby County appealed, arguing that the warrants constituted a debt under § 224. In support, the taxpayers cited Taxpayers & Citizens of Town of Georgiana v. Town of Georgiana, 265 Ala. 654, 93 So.2d 493 (1956).
In Town of Georgiana, the Town of Georgiana sought to issue warrants for the purpose of obtaining money to build a public hospital. The Town of Georgiana levied a broad-based gross-receipts tax and pledged the revenues from that tax to the payment of the warrants. The tax revenues would otherwise have been available for general municipal purposes. The trial court approved the issuance of the warrants. This Court reversed the trial court's judgment and found that the Town of Georgiana would become indebted within the meaning of Ala. Const.1901, § 225, which limits the constitutional debt of municipalities. In Acker, the Court distinguished Town of Georgiana on two grounds, and held the tax pledge and warrants to be valid.

1. Refunding principle

First, we distinguished Acker from Town of Georgiana because of the different effect upon the taxpayers in Shelby County and those in Georgiana of the levy of the tax and the issuance of the warrants. In Town of Georgiana, the pledge of the tax revenues to service the warrants actually increased the burden on the taxpayers because the tax revenues otherwise available for general municipal purposes were being displaced. In Acker, on the other hand, the pledge of the special tax to the warrants might have ultimately reduced, rather than increased, the tax burden on citizens in Shelby County. The Court in Acker said:
"If the pledge of the Shelby County special tax affects taxation, it could result in reducing rather than increasing taxes for the County's citizens. The special tax has been levied for the purpose of retiring existing debt of the County and, in the absence of revocation of the levy by the governing body of the County, it will continue in effect even if the warrants are never issued. Here, a reduction in debt service could result in an earlier retirement of the balance of all outstanding debt of the County; that earlier retirement would then result in the termination of the special tax at a date earlier than 10 years from the date of the first levy. An early termination of the special tax, rather than imposing an additional burden on the citizens, *1079 would be an unexpected relief from a burden that, without the issuance of the warrants, will continue for the full 10-year period authorized for the collection of the special tax."
641 So.2d at 261-62 (footnote omitted).
The Chism plaintiffs argue that, in this regard, the case before us is distinguishable from Acker. Whereas in Acker the pledge of the tax revenues had the potential to decrease the tax burden by ultimately allowing for early termination of the special tax, the pledge of the proceeds of the education taxes appears to offer no such possibility. In other words, the Chism plaintiffs argue, the decision in Acker was based on the principles related to refunding warrants enunciated in Taxpayers & Citizens of Shelby County v. Shelby County, 246 Ala. 192, 20 So.2d 36 (1944), which is not applicable in this case because the education warrants are not refunding warrants.
However, the Court's decision in Acker was not dependent on the refunding principle to which it alluded. As Jefferson County points out, "by far the greatest principal amount of the obligations refunded in Acker constituted the sewer revenue warrants that were not debts of the county for purposes of Section 24 (a fact clearly understood by the Supreme Court as reflected in statements contained in the dissenting opinion)." Jefferson County's brief, p. 40. The Acker dissent disputed the majority's contention that the warrants might decrease the tax burden: "The debt that is being refinanced is not the debt of the county. The existing warrants are revenue warrants payable solely from revenue produced by the issuing authorities. Under the proposed scheme, the county assumes those debts and they will become payable from the taxes imposed by the county." 641 So.2d at 264 (Shores, J., dissenting).
The Chism plaintiffs contend that the main opinion in Acker relied on an erroneous conclusion that the warrants effectively reduced the overall debt of the county in order to hold that the warrants in that case were not to be charged against the constitutional debt limit; however, it appears that the Acker Court was aware of the facts. The main opinion is not inconsistent with that view. Its discussion of this "factor" begins with the words: "If the pledge of the Shelby County special tax affects taxation, it could result in reducing rather than increasing taxes for the County's citizens." 641 So.2d at 261 (emphasis added). The main opinion relies primarily, not on a possible reduction in taxes, but on the second factor that distinguishes Acker from Town of Georgiana  that the warrants were to be paid from a new source of revenue. Thus, it appears that the Chism plaintiffs are incorrect in their argument that the Acker Court held the warrants at issue in that case valid solely or primarily because some of them refunded existing debts of the county and thus might reduce the tax burden on the citizens of Shelby County. Instead, the Court's decision in Acker was based on the alternative, and apparently primary, factorthat the warrants had as their source of payment a new revenue source that was not otherwise available for payment of general expenses.

2. New revenue source not otherwise available for general government purposes

In Acker, this Court distinguished Town of Georgiana on the fact that the warrants in Acker had as their source of payment a "limited, specified source of funds not otherwise available for payment of general municipal expenses," 641 So.2d at 262, whereas in Town of Georgiana the tax that was pledged for payment of the warrants was otherwise available for general *1080 municipal purposes. The Court wrote:
"However, the present case is distinguishable from Town of Georgiana. In Town of Georgiana, the governing body of the municipality levied a broad-based gross receipts tax and pledged the proceeds thereof to the payment of the proposed warrant issue. The proceeds would otherwise have been available for general municipal purposes. The pledge of the tax for the payment of the warrants could have indirectly imposed a greater burden on the taxpayer because of the fact that revenues otherwise available for general municipal purposes were being displaced.
". . . .
". . . [T]he warrants proposed to be issued in Town of Georgiana had as their source of payment revenues that otherwise would have been available for general municipal purposes and those warrants would thus constitute a debt in the constitutional sense. Here, however, the warrants the County proposed to issue have as their source of payment a limited, specified source of funds not otherwise available for payment of general municipal expenses. The warrants here are neither secured by nor payable out of the general credit of the County. A single source of revenue has been secured for the payment of the warrants, and it is to this source alone that a warrant holder must look for payment. The County has made no promise to pay in the event that the proceeds of the special tax are insufficient; neither has the County pledged that the proceeds will be sufficient; nor is there a pledge of the general credit of the County. Rather, the warrant resolution limits the payment source of the warrants to the proceeds of the special tax and states that the warrants are limited obligations of the County, not subject to payment from any other source or funds of the County if the proceeds of the special tax prove inadequate. There is no guarantee offered that the revenues derived from the special tax will be adequate to pay the debt service secured thereby.
"The proceeds of the special tax cannot be mingled with funds available for general municipal purposes, but are to be deposited into a special account `to be used exclusively to pay off the indebtedness of the county that is existing on the effective date of this act.' Act 93-188, § 8."
641 So.2d at 261-62.
Thus, the two critical factors in the Court's determining that the warrants in Acker differed from those in Town of Georgiana and were thus not chargeable against the constitutional debt limit were: (1) that the source of the funds that would service the debt created by the warrants was a source not available for general government purposes and (2) that the warrants were payable only from that source of funds and not from the general government funds. Thus, the pledge of the taxes to service the warrants did not displace revenue otherwise available for general governmental purposes. The same is true in this case. The education warrants will be serviced exclusively by the proceeds of the education taxes, which are not available for general purposes of the County, and the pledge of the education taxes does not displace funds that would be available for general governmental purposes. Thus, these education warrants are not § 224 debt of the county. We, therefore, agree with Jefferson County that Acker indicates that the pledge of the education taxes does not constitute debt chargeable against its constitutional debt limit.
The Chism plaintiffs argue that we should overrule Acker as being contrary to *1081 the earlier interpretations of § 224 beginning with Hagan v. Commissioner's Court of Limestone County, 160 Ala. 544, 49 So. 417 (1909). In Hagan this Court considered § 224 for the first time. In Hagan, the Commissioner's Court of Limestone County had contracted with Falls City Construction Company for the construction of a new courthouse at the price of $59,000 "and the interest thereon at the rate of 6½ per centum per annum, payable semiannually." 160 Ala. at 547, 49 So. at 418. In addition, the commissioners had passed a resolution levying, pursuant to Ala. Const.1901, § 215, a "special county court house tax of one-fourth of one percentum on all taxable property of said county," 160 Ala. at 547, 49 So. at 418, for the years 1909 through 1917, not to exceed $59,000 and "the interest thereon as represented by the county courthouse warrants provided for in the contract. . . ." 160 Ala. at 547, 49 So. at 418. The contract provided that the "`county hereby sells, assigns, transfers, sets over and confirms to the said Falls City Construction Company, all of the special county courthouse tax levy and all of the proceeds derived from the levy and collected of the special courthouse tax and levy thereof. . . .'" 160 Ala. at 548, 49 So. at 418. In addition, the county "`agree[d] to evidence said sum and installments above set out by the issuance of valid and lawful warrants drawn on said fund for the principal and interest thereon. . . .'" 160 Ala. at 549, 49 So. at 418-19. The contract provided that "`it is agreed that no debt is hereby created or incurred by said county, but instead thereof a transfer and assignment of the proceeds of said special tax levy . . . are made to said contractor as the consideration and payment for the [construction of the] courthouse building.'" 160 Ala. at 549-50, 49 So. at 419.
It was argued that the contract and the pledge of the tax levied under § 215 created a debt against the county, causing the county to exceed the debt limit prescribed by § 224. The Court noted that, if the amount was a debt, the debt limit of the county had been exceeded, and the contract was void "unless the effect of section 215 of the Constitution of 1901-on account of the purposes for which the levy and contract were madeis to exempt them from the inhibition contained in section 224." 160 Ala. at 551, 49 So. at 419. The Court stated that "[u]pon its face section 224 would seem to afford no room for construction. Its language is clear and explicit and self-construing." 160 Ala. at 552, 49 So. at 419. However, it was "thought that the question at issue becomes a complicated one when viewed in light of section 215 of the Constitution," 160 Ala. at 552, 49 So. at 419, which provided:
"`No county in this state shall be authorized to levy a greater rate of taxation in any one year on the value of the taxable property therein than one-half of one per centum: . . . provided, that to pay any debt or liability now existing against any county, incurred for the erection, construction, or maintenance of the necessary public buildings or bridges, or that may hereafter be created for the erection of necessary public buildings, bridges or roads, . . . any county may levy and collect such special taxes, not to exceed one-fourth of one per centum, as may have been or may hereafter be authorized by law, which taxes so levied and collected shall be applied exclusively to the purposes for which the same were so levied and collected.'"
160 Ala. at 552, 49 So. at 419.
The Court interpreted the provision in § 215 that allows for a special tax to be applied exclusively to a new project permissible *1082 only in a county that was not already at its debt limit:
"Construing the two sections of the Constitution together, it is obvious that section 215 is without any field of operation in a county the indebtedness of which is up to the limitation fixed by section 224, or whose indebtedness, added to the debt contemplated or about to be constructed, will exceed that limitation; and it is only in those counties not so indebted that section 215 may be brought into play and applied."
160 Ala. at 552-53, 49 So. at 420. Thus, the Court held that the pledge of the § 215 tax constituted a debt chargeable to the county's constitutional debt limit under § 224.
The Chism plaintiffs argue that the § 215 tax in Hagan, the pledge of which constituted § 224 debt, is significantly similar to the pledge of the education taxes in this case: both are special-purpose taxes that cannot be used for general governmental purposes. The § 215 tax was limited to servicing existing or new debt on public buildings (and could not be used for general governmental purposes),[28] just as the education taxes in this case are limited to payment of debt service on the education warrants issued for improvement of public schools (and not for general governmental purposes). Despite this limitation on the purpose of the § 215 tax in Hagan, the Court held that the warrants constituted debt chargeable against the county's debt limit.
However, Hagan differs significantly from Acker and from the case before us today. Hagan involved a property tax authorized by § 215 of the Alabama Constitution; the tax in Acker was a privilege and license tax authorized by Act No. 93-188, Ala. Acts 1993, and the tax in this case is a privilege and license tax authorized by a Ala.Code 1975, § 40-12-4. We cannot say that this Court's conclusion in Hagan in 1909 that warrants supported by a pledge of a property tax levied under § 215 must be charged against the county's debt limit indicates that the warrants supported by a pledge of the privilege and license tax levied in Acker and the education taxes in this case must also be included in a county's constitutionally cognizable debt.[29]
*1083 The debates at the Constitutional Convention of 1901 indicate that the drafters' purpose in including a debt limit in the Alabama Constitution was to prevent counties from defaulting on their debtsin other words, to assure that the counties were able to pay the interest on their debts, given the limits on their ability to tax.[30] In his opening address to the convention, President Knox stated: "Some just provision should be incorporated, limiting the power to create debt beyond the reasonable ability of the county or municipality to pay." 1 Official Proceedings of the Constitutional Convention of 1901, p. 15. Mr. Weakley later stated:
"In my opinion the question of a debt limit is more important than the question of a tax limit. If the Constitution of 1875 had inserted in it some limitations upon the taxing power of the cities and counties of this State to create debts, the present financial condition with which we are confronted would not exist today . . . [T]he county of Jefferson has an assessed valuation of forty millions of dollars, and under this limitation the county of Jefferson can create debt of $1,200,000, and I submit, gentlemen, that debt is all that the county of Jefferson is able to pay the interest on with the proceeds of a fifty cent tax rate."[31]
2 Official Proceedings, p. 1450. Mr. Harrison said: "The great necessity for it is that no county, no municipality, city or town, should be permitted to incur a debt which they cannot reasonably expect to pay within the limit of taxation authorized by the State." 2 Official Proceedings, p. 1454. To encumber the county's property with a tax would affect the ability of the county to meet its obligations. When, as in this case, the general credit of the county is not implicated and the debt is to be paid with a new source of revenue that is not otherwise available for general governmental purposes, there is no danger that the county will be unable to pay the debt from its general revenues. Thus, we do not conclude that the education taxes and the taxes in Acker are contrary to Hagan or to the Alabama Constitution. Consequently, we are not inclined to overrule Acker.
In addition, to the extent that Hagan supports the Chism plaintiffs' position, it appears to have been abrogated by other cases. This Court has previously indicated that the pledge of a new revenue source, not otherwise available for the general purposes of the issuing body, would not implicate the constitutional debt limit. As we discussed above, Town of Georgiana, supra, held that the warrants were chargeable against the constitutional debt limit because the taxes pledged for their payment were otherwise available for general government purposes and, thus, the pledge of those revenues displaced otherwise available revenue. Although Town of Georgiana does not go so far as to hold that the pledging of revenue that is not otherwise available for general governmental purposes is not constitutional debt of the town, it does lend support to that proposition, and it certainly is not contrary to the holding in Acker that such obligations are not chargeable against a county's constitutional debt limit. We have said that "obligations payable solely from *1084 the proceeds of privilege taxes, duly levied and pledged thereunto, not to become a burden on the general taxpayer, are not inhibited." Wharton v. Knight, 241 Ala. 218, 220, 2 So.2d 310, 311 (1941).[32]
Section 215 is one of three parallel constitutional provisions: § 215 (applicable to counties), § 213 (applicable to the State), and § 225 (applicable to municipalities). Because they are parallel provisions, we can, and often do,[33] look to analyses of one of these constitutional provisions for guidance in analyzing one of the others. In Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966),[34] this Court identified seven characteristics of statutory funding mechanisms it had previously upheld as not creating or incurring a "debt" under the constitutional debt limit applicable to the State:
"(1) Each [of the statutes] provides that the bonds authorized to be issued thereunder shall not be general obligations of the issuing body but shall be payable solely out of the funds appropriated and pledged under the provisions of the applicable act;
"(2) Each [of the statutes] provides that the bonds authorized to be issued thereunder shall not constitute or create an obligation or debt of the State of Alabama;
"(3) Each [of the statutes] appropriates and pledges for the accomplishment of the purposes thereof so much as may be necessary of receipts of an excise tax of the State of Alabama;
"(4) In none of the statutes was there any representation or agreement of any kind that there would ever be any receipts from the tax pledged or that the receipts, if any, would be sufficient to service the bonds;
"(5) In none of the statutes was there either a pledge of the faith and credit of the State or an agreement to pay the appropriation from any other funds if those appropriated should be insufficient to service the bonds;
"(6) Each of the statutes authorized the use of proceeds of the bonds issued thereunder for a purpose of state-wide interest;
"(7) Each of the statutes appropriated and pledged for the servicing of the bonds the receipts of a special tax which had not theretofore been paid into the general fund of the State."
279 Ala. at 211, 184 So.2d at 119-20. The issue in this case is whether the fact that the special tax pledged is a new revenue source not otherwise available for general purposes exempts the education warrants from being charged against Jefferson County's constitutional debt limit. We noted in Opinion of the Justices No. 346, 665 So.2d 1357 (Ala.1995), that, pursuant to Edmonson, it is critical to a finding that warrants do not constitute debt chargeable against the State's debt limit that they be serviced by a new revenue source that would not otherwise be available for the general fund. In Opinion of the Justices No. 346, the Justices expressed their opinion that a proposed bond issue by the *1085 Alabama Incentives Financing Authority would be included in the State's constitutional debt limit "because it does not create a new revenue source to retire the bonds . . . but attempts to divert funds that heretofore have been, and, by constitutional provision, must be paid into the General Fund." 665 So.2d at 1362. In so concluding, the Justices noted: "[C]ritical to the Edmonson holding is the fact that the bonds were to be retired by a new revenue source, one that had not theretofore been payable to the General Fund." 665 So.2d at 1362.
This Court has quoted favorably Dillon on Municipal Corporations in determining whether certain debts are chargeable against the constitutional debt limit on municipalities. See Hillard v. City of Mobile, 253 Ala. 676, 47 So.2d 162 (1950) (quoting extensively from Dillon on Municipal Corporations § 196, p. 359 (5th ed.1911)).
Dillon addresses the case involving the issuance of bonds for the erection of a public improvement payable in the future:
"The qualifications upon the anticipation of revenues apply only to revenues to be raised by taxation for the general purposes of the municipality, and not to special assessments, the proceeds of which are specifically devoted to the improvement in connection with which the indebtedness is created. As shown [in § 198], obligations charged and chargeable solely under legislative authority upon and payable exclusively from a special fund to be created by the levy of a special assessment or other special fund do not come within the constitutional prohibition."
Dillon § 194 (footnotes omitted).[35]
We agree with the trial court and with Jefferson County that this case is like Acker. Having examined the authority upon which the Chism plaintiffs rely, we are not prepared to overrule Acker.

B.
There is a second aspect of the constitutional-debt-limit issue that we must consider. Jefferson County argues that it has not pledged its full faith and credit toward the repayment of the principal amount of the education warrants, but concedes, as it must, that it has pledged its full faith and credit to repayment of the education warrants in the event of an extraordinary mandatory redemption. However, Jefferson County contends, the amount of this contingent obligation is less than the County's available constitutional debt limit. Jefferson County asserts that when it issued the education warrants, its constitutional debt limit was $360.3 million and that its constitutional indebtedness was $330.8 million, leaving it with an available debt cushion of $29.5 million. Jefferson County also contends that its shortfall obligation on an extraordinary mandatory redemption, if that event were to occur, will not be more than $14,523,126.
The Chism plaintiffs argue that, even if only the shortfall obligation counts toward Jefferson County's constitutional debt limit, then the summary judgment was improper because, they say, there is a fact *1086 question as to the amount of the shortfall obligation, and that fact question precludes a summary judgment. The trial court characterized the Chism plaintiffs' argument as the equivalent of "saying that the Ordinance should be invalidated because of what might happen if it is invalidated."[36]
The Chism plaintiffs question first Jefferson County's factual assertions regarding its constitutional debt limit before the issuance of the education warrants. Second, the Chism plaintiffs doubt the reliability of the evidence Jefferson County offered to demonstrate that any shortfall obligation would be less than its constitutional debt "cushion." However, in opposition to Jefferson County's summary-judgment motion, which presented evidence indicating that the shortfall obligation was less than the constitutional debt limit, the Chism plaintiffs appear to have offered no substantial evidence creating a genuine issue of material fact on the point. See Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997) ("When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue."). Jefferson County is correct that it was incumbent upon the Chism plaintiffs to set forth specific facts, supported by substantial evidence, indicating that there is a genuine issue of material fact on the issue. See Rule 56, Ala. R. Civ. P. Thus, it appears that this argument by the Chism plaintiffs does not have merit.

IV.
The Chism plaintiffs argue that the trial court erred in not allowing them to be heard on their Rule 59, Ala. R. Civ. P., motion to alter, amend, or vacate the trial court's summary judgment. Rule 59(g), Ala. R. Civ. P., provides that posttrial motions "remain pending until ruled upon by the court (subject to the provisions of Rule 59.1), but shall not be ruled upon until the parties have had opportunity to be heard thereon." "[I]f a party requests a hearing on its motions for a new trial, the court must grant the request." Ex parte Evans, 875 So.2d 297, 299-300 (Ala.2003) (citing Rule 59(g), Ala. R. Civ. P., and Walls v. Bank of Prattville, 554 So.2d 381, 382 (Ala.1989)). Although it is error for the trial court not to grant such a hearing, this error is not necessarily reversible error. "This Court has established, however, that the denial of a postjudgment motion without a hearing thereon is harmless error, where (1) there is . . . no probable merit in the grounds asserted in the motion, or (2) the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court." Historic Blakely Auth. v. Williams, 675 So.2d 350, 352 (Ala.1995) (citing Greene v. Thompson, 554 So.2d 376 (Ala.1989)). Here, we have resolved the matters adversely to the Chism plaintiffs. In addition, as in Historic Blakely Authority, the issues were argued to the trial court in briefs. Thus, any error in failing to hold a hearing was harmless.

Conclusion
We cannot conclude that the trial court erred in determining that Jefferson County *1087 has the statutory to issue the education warrants and to pledge the taxes to service the debt on the education warrants. Nor are we convinced that we should overrule Acker and conclude that the issuance of the education warrants and the pledge of the education taxes have caused Jefferson County to exceed its constitutional debt limit. In addition, any error of the trial court in failing to hold a hearing on the Chism plaintiffs' Rule 59, Ala. R. Civ. P., motion was harmless.
AFFIRMED.
LYONS, HARWOOD, WOODALL, and SMITH, JJ., concur.
STUART, J., concurs in the result.
BOLIN and PARKER, JJ., dissent.
NABERS, C.J., recuses himself.
BOLIN, Justice (dissenting).
I believe the revenue from the education taxes must be distributed to local school boards based on their respective annual Foundation Program costs and that that revenue cannot be diverted as debt service on the interest-bearing tax-anticipation warrants issued by Jefferson County pursuant to ordinance no. 1769. Accordingly, I must respectfully dissent.
Section 40-12-4, Ala.Code 1975, provides counties the authority to tax; it states, in pertinent part:
"(a) In order to provide funds for public school purposes, the governing body of each of the several counties in this state is hereby authorized by ordinance to levy and provide for the assessment and collection of franchise, excise and privilege license taxes with respect to privileges or receipts from privileges exercised in such county, which shall be in addition to any and all other county taxes heretofore or hereafter authorized by law in such county. Such governing body may, in its discretion, submit the question of levying any such tax to a vote of the qualified electors of the county. If such governing body submits the question to the voters, then the governing body shall also provide for holding and canvassing the returns of the election and for giving notice thereof. All the proceeds from any tax levied pursuant to this section less the cost of collection thereof shall be used exclusively for public school purposes, including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor.

"(b) Notwithstanding anything to the contrary herein, said governing body shall not levy any tax hereunder measured by gross receipts, except a sales or use tax which parallels, except for the rate of tax, that imposed by the state under this title. Any such sales or use tax on any automotive vehicle, truck trailer, trailer, semitrailer, or travel trailer required to be registered or licensed with the probate judge, where not collected by a licensed Alabama dealer at time of sale, shall be collected and fees paid in accordance with the provisions of Sections 40-23-104 and 40-23-107, respectively. No such governing body shall levy any tax upon the privilege of engaging in any business or profession unless such tax is levied uniformly and at the same rate against every person engaged in the pursuit of any business or profession within the county; except, that any tax levied hereunder upon the privilege of engaging in any business or profession may be measured by the number of employees of such business or the number of persons engaged in the pursuit of such profession. In all counties having more than one local board of education, revenues collected under the provisions of this *1088 section shall be distributed within such county on the same basis of the total calculated costs for the Foundation Program for those local boards of education within the county."

(Emphasis added.)
Section 40-12-4(a) provides that "the proceeds from any tax levied" pursuant to that Code section "less the cost of collection thereof" shall be used exclusively for public-school purposes. The legislature's subtracting "the cost of collection" from "any tax levied" indicates that the legislature clearly anticipated reimbursing the county for the ongoing, annual costs each county incurred in collecting and distributing the tax revenue. If the legislature had desired to provide for a scheme such as the one used by Jefferson County here, the legislature could have easily stated that the costs of the issuance of bonds or warrants could alternatively be subtracted; if it had done so there would be little doubt that the issuance of these warrants would have been embraced within the legislative intent. However, the legislature does not expressly refer to the issuance of bonds or warrants for the support of public schools by the governing body of the county, nor does it refer to the fees and costs that would be incurred in connection with the county's issuance of such bonds or warrants. In addition, § 40-12-4(b) provides that "revenues collected under the provisions of this section shall be distributed" on a proportionate basis pursuant to the Foundation Program formula. The distribution of "revenues collected" from the levy of the tax under this section is quite different from the distribution of the proceeds of tax-anticipation warrants.
"In discussing statutory construction this Court has stated:
"`[When a court] is called upon to construe a statute, the fundamental rule is that the court has a duty to ascertain and effectuate legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purposes sought to be obtained.'
"Ex parte Holladay, 466 So.2d 956, 960 (Ala.1985). In IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992), this Court further stated with regard to statutory construction:
"`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"
Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998). Additionally, subsections of a statute are read in pari materia, i.e., they are construed together to ascertain the meaning and intent of each. Ex parte Jackson, 614 So.2d 405 (Ala.1993); McCausland v. Tide-Mayflower Moving & Storage, 499 So.2d 1378 (Ala. 1986).
Section 40-12-4(b) requires that, in counties having more than one local school board, the tax revenues collected pursuant to the authority conferred by § 40-12-4(a) must be distributed on the same basis as are the Foundation Program costs. The Foundation Program Fund is established by § 16-13-230 et seq., Ala.Code 1975 the Foundation Program Act. The Act provides that various state and county funds are "apportioned and paid to local boards of education," and the respective boards then determine how to spend the funds based on the needs of that school system. § 16-13-231(a). The funds are distributed *1089 to the local school boards based on the student population of the local school system, as determined by the number of pupils in average daily membership during the first 40 scholastic days of the preceding school year. § 16-13-231(b)(2)c.[37] The State superintendent of education makes the annual apportionment of funds to the local boards. § 16-4-5.
Accordingly, the taxes collected must be distributed to the various local school boards in proportion to their respective annual Foundation Program shares, to be used by those school boards for the particular educational needs of their systems. Such needs may well include a local board's incurring debt for school construction to be paid by a pledge of the board's portion of the tax revenues collected. Such needs may also include the use of the tax revenues to retire or amortize preexisting debt of that board that had been used for school construction. It could also be used for additional teacher units, pay supplements, or anything else the local school board deems proper, rather than the county governing board unilaterally deciding what would be the best use of the tax revenues collected.[38] Tying the distribution of these tax revenues to, in essence, student population provides each school district with the revenues for its proportional needs, based upon the ebb and flow of its annual student population. That intent as expressed in § 40-12-4(b) matches the purpose of the Foundation Program Fund as expressed in § 16-13-231(a)(2), which states that the Fund shall be used principally "to assist in the promotion of educational opportunities for all children in the public schools." (Emphasis added.)
Pursuant to ordinance no. 1769, the moneys collected from Jefferson County's tax-anticipation warrants will be paid by grants to those school systems in existence when that ordinance was passed[39] and based on student population as it existed in 2003. The ordinance makes no provision for any local school system created after the effective date of the ordinance and throughout the term of the levy of the tax necessary to refund the indebtedness on the education warrants. Therefore, there *1090 is great potential that taxpaying citizens of a newly created system will have children attending school in a system that receives no benefit from the indebtedness created pursuant to this ordinance, although those citizens are paying sales tax on every purchase they make, which then pays for school construction in other districts.[40] Such a result from the distribution of these sales-tax revenues based solely on a 2003 student-population count would be exceedingly unfair and inconsistent with the needs-based, annual census of the student population of a school district and completely inconsistent with the legislative intent expressed in § 40-12-4(b), which links distribution of the sales-tax proceeds to the Foundation Program, predicated entirely on ever-changing annual student censuses. I am sure that the number of school systems and of students educated within each system in 1988 bears little relation to the number of school systems and of students in Jefferson County in 2003; the same can certainly be said prospectively for the potential number of school systems and of students educated in Jefferson County 15 years after the 2003 "distribution" determination date provided for in ordinance no. 1769.
This harsh inequity and lack of equal protection for all students and all existent and future school systems would not result if both subsection (a) and (b) of § 40-12-4 were read in pari materia, as Ex parte Jackson and McCausland require. Section 40-12-4(a) authorizes the county governing body to levy a tax as Jefferson County did in this matter. The Chism plaintiffs do not dispute that Jefferson County has the authority to levy the education taxes, and they do not argue here that Jefferson County was without authority to levy the taxes. The only limitation in § 40-12-4(a) is that the proceeds "shall be used exclusively for public school purposes, including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor." The phrase "public school purposes" on its face appears all-encompassing as it pertains to the use and expenditure of the proceeds. The question therefore ariseswhich governmental entity has the responsibility for public education? Is it the county governing body or the county and/or local school board or boards? Clearly, public education is not the responsibility of the county commission. Providing additional funding for public education, however, is a legislative prerogative, whether at the state level, or, as here, delegated to the county. What is nowhere expressly delegated to the county governing body is the discretion to determine the proper expenditure of funding for public-school purposes. This is the role of the local school board[41] entirely, and that *1091 role is not abrogated simply because the county governing body is the party levying and collecting taxes authorized by § 40-12-4.
The majority states that "it is at least doubtful whether the reference in § 40-12-4(b) to the Foundation Program Fund limits the provision in § 40-12-4(a) allowing § 40-12-4 taxes to be used to service debt." 954 So.2d at 1067. Construing subsections (a) and (b) of § 40-12-4 in pari materia, however, compels the interpretation that the particular debt to be serviced is a debt of the local school board, and this interpretation would remove any such doubt.
A reasonable interpretation of the limitation in § 40-12-4(a) that the tax proceeds be used for "public school purposes" as modified by the phrase "including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor" is that the legislature was providing, so that there would be no question, that such revenues could be used by the school boards for the cost of building schools, or, alternatively, for paying the existing debt of the school board for those schools that had already been built. This interpretation would allow the arm of government charged with educating our children to make this decisionnot the arm of government charged with noneducation responsibilities. The decision whether to build or to pay for more buildings, as opposed to the decision whether to hire more teachers, or to supplement teacher pay, should be decided by the local school board. The majority's interpretation of § 40-12-4 allows the county governing board to make this education decision.
Even though the two subsections of § 40-12-4 must be read together, this Court has previously decided which of the two subsections prevails in the event of a conflict between the two. In Brown v. Board of Education of Montgomery County, 863 So.2d 73 (Ala.2003), this Court held that an occupational tax imposed by an ordinance adopted by the Montgomery County Commission was invalid. The Montgomery County Commission had passed an ordinance imposing a 1.5 percent tax on "Employee Compensation" and "Owner Compensation" received by individuals who work in Montgomery County. The Board of Education of Montgomery County filed an action seeking to validate the tax and $100 million in revenue warrants funded by the tax. The proceeds from the occupation tax were pledged to the Board "`for public school purposes, including, without limitation, the payment of the principal of, premium, if any, and interest on the Warrants.'" 863 So.2d at 75. This Court held that the tax violated § 40-12-4. Although § 40-12-4(a) authorizes *1092 taxes for certain school purposes, this Court determined that § 40-12-4(b) "trumped" any contrary language in § 40-12-4(a). Specifically, this Court stated:
"By beginning with the phrase `[n]otwithstanding anything to the contrary herein,' § 40-12-4(b) expressly trumps any contrary language in § 40-12-4(a) because we interpret `herein' as referring to anything else in § 40-12-4. Hence, anything in § 40-12-4(b) that is inconsistent with the levy of an occupational tax supersedes any reference in § 40-12-4(a) that could be read as encompassing such a tax."
863 So.2d at 77.
Therefore, § 40-12-4(b) and its language concerning "counties having more than one local board of education" limits and "trumps" the provision of § 40-12-4(a); the further provision of § 40-12-4(b) concerning the Foundation Program (which is based on annual calculations, not one annual calculation) illustrates that a one-time, 2003 snapshot Foundation Program formula distribution for purposes dictated and decided by the county governing body is completely contrary to the expressed legislative intent of the entirety of § 40-12-4.
If we assume that a hypothetical county governing body desired to levy a sales tax pursuant to § 40-12-4 for the purpose of providing funding for the construction of a school building or to retire school-board debt, and if the school board or boards affected resolved that such a plan was a desired expenditure, a consideration of the potential scenarios arising from this hypothetical further buttresses the above statutory interpretation. Consider first an example of a county having only one school systema county board of education. Should that county governing body levy a § 40-12-4 tax, the proceeds from the tax would be paid to that single county board of education. The county board could then either use the revenues to service or to retire existing school-construction debt, or it could incur new debt and pledge the revenues as a source of payment for that debt, as its desires or needs may dictate. Thereafter, should a new school system in that county come into existence, only two possibilities could exist. If there was a county school building taken in by the area of the new system, then § 16-8-20 et seq., Ala.Code 1975, would provide for the building transfer and any transactions necessary concerning any existing indebtedness on the building, together with "providing the same or equivalent school facilities for the children in that part of the territory in the school district or districts not annexed or made a part of such city." Thus the new system would be obligated to pay for any indebtedness on that school, as well as negotiating with the county board to provide for students who previously attended that school but who did not live in the area of the new municipal system. However, § 40-12-4(b) would then apply to the new system, as the hypothetical county would now have more than one local school board, and the following year the new system would begin receiving its pro rata distribution of tax revenues as determined by the Foundation Program formula. These revenues could then be used to pay the negotiated (or arbitrated pursuant to § 16-8-21) consideration for the former county school building now located in the new school system. Considering the other possible example, i.e., if there were no county school building located in the area of the new municipal system, the new system would not owe the county board anything, but would then begin to receive its § 40-12-4(b) Foundation Program formula revenues, which it, the local school board, could use for its own school construction.
*1093 Again, when § 40-12-4(a) and (b) are construed together, a similar result would apply in counties, such as Jefferson County, already having more than one system. The county governing body could levy a sales tax for school purposes, as provided in subsection (a). The revenues would be distributed to each system according to its share, as determined by the Foundation Program formula, as provided in subsection (b). Each system could then exercise its proper discretion to determine how the revenues should be spent for school purposes. As stated above, should the particular system want to pay down or refund existing debt, it could do so. Should the particular system wish to issue new debt for construction and pledge its share of the revenues to pay for that debt, it could do so.[42] Should the particular system decide to use the revenues for other school purposes, it could do so, and it would be the appropriate authority to make that decision.
The majority opinion asserts that the Chism plaintiffs conceded that Jefferson County's scheme would have been permissible under § 40-12-4(a) if Jefferson County had only had one board of education. Assuming that the Chism plaintiffs conceded this example,[43] a party cannot agree to an erroneous principle of law or *1094 statutory interpretation. Yet based upon this alleged concession the majority concludes that § 40-12-4(a) and (b) would be contradictory under the Chism plaintiffs' argument and violative of the presumption that the legislature does not intend to contradict in one paragraph what it declared in another. There is no contradiction here. Rather, there is only a tortuous construction of an act, which will allow a county commission not only to lawfully levy a tax, but to go further and without authority assess school-system needs and respond to those needs. Under the above illustration the Jefferson County Board of Education should be the recipient of the tax revenues and would itself then be the issuer of the education warrants, pursuant to § 16-13-70,[44] with the accompanying pledge of the sales tax levied. The scheme implemented by Jefferson County is akin to the action of the Alabama legislature this Court struck down as unconstitutional in McInnish v. Riley, 925 So.2d 174 (Ala. 2005), because one branch of government was both appropriating funds and spending funds.
I also write to point out that when ad valorem property taxes are used for school funding, the property owners of the taxing district incur the full cost of the funding, which is tied to the assessed value of their real property. In contrast, however, sales taxes are paid by whoever shops in the taxing district.[45] As stated earlier, the consumers who live in newly created school districts and who make purchases during the term of this tax will be paying tax revenues to Jefferson County to retire indebtedness for which they will receive no benefit whatsoever, as the expenditures of the warrant proceeds will already have been made on an out-of-date 2003 student-population count, completely ignoring future needs of new school systems and the students they must educate. This could *1095 have the potential of deterring citizens in municipalities that currently have no school system, or in communities that incorporate in the future and might desire their own school systems, from creating their own municipal systems because of their inability to participate in this already completed billion-dollar construction program. Such a result would reward systems and citizens in already developed portions of Jefferson County and school systems with declining enrollments, while prospectively penalizing currently undeveloped, future growth areas of Jefferson County. Put another way, ad valorem taxes for school funding always stay attached to the real property upon which they are levied, and the proceeds derived from ad valorem taxes are fixed based on the millage levied when the tax was created. By their very nature such ad valorem taxes are distributed irrespective of the number of students who reside on such real property and attend school in the school district where the real property is located. These taxes are certainly a static and stable funding basis. However, sales taxes that are to be distributed according to the Foundation Program formula necessarily will fluctuate based on the growth of the county and the economy, so it was entirely logical that the legislature would provide that such a variable source of funding would follow the trail of where most of the students are located, and hence, most of the student needs. For the funding basis countenanced by the majority to remain consistent throughout the period this sales tax would be collected, there would have to be no new school systems created, and each school system would either have to grow or decline on the same pro rata basis. History tells us that it is inconceivable that that would happen in the largest county, and largest metropolitan area, in the State of Alabama.
PARKER, J., concurs.
PARKER, Justice (dissenting).
To protect the people from profligate politicians, the Alabama Constitution strictly limits the debt burden of a county, as well as of a municipality and the State. The text of the constitutional debt limit for counties is clear and comprehensive; it allows no exceptions. Nevertheless, Jefferson County has issued debt warrants that, in the name of education for the children, not only violate the text and intent of the Constitution, but also burden with excess debt the future of the very children the County purports to serve.
That Jefferson County's debt scheme even accompanied by its targeted tax hikeviolates the Alabama Constitution is supported by the historic context, by the plain language of the text of § 224, Ala. Const.1901, itself, and by dozens of decisions of this Court over nearly 100 years. Regrettably, the majority opinion in this case disregards the weight of authority against Jefferson County in favor of a single, inapplicable precedent of this Court.
I. The historic context of § 224, Ala. Const.1901, shows that its basic purpose is to protect the people from excessive taxes resulting from too much county debt.
To most fully and faithfully interpret a text, one must consider its context when written. I apply this principle below to § 224, Ala. Const.1901, the constitutional provision primarily at issue in this case.
A. Alabama's written constitution, like other American constitutions, was drafted primarily to protect the people from the state.
In America, constitutions were efforts by the colonists and, later, the citizens of *1096 the states to protect their God-given lives, liberty, and property by binding civil government with chains in the form of written limitations. These "important structural protections," which were "built into the very warp and woof of the Constitution," were "designed to safeguard freedom." Ronald D. Rotunda, The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Court?, 55 Ark. L.Rev. 795, 797 (2003). As United States Supreme Court Justice William O. Douglas explained,
"The institutions of our society are founded on the belief that there is an authority higher than the authority of the State; that there is a moral law which the State is powerless to alter; that the individual possesses rights, conferred by the Creator, which [civil] government must respect."
McGowan v. Maryland, 366 U.S. 420, 562, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (Douglas, J., dissenting). The early Americans were especially careful when drafting constitutional provisions to strictly limit the state's ability to burden the people financially because:
"An unlimited power to tax involves, necessarily, a power to destroy; because there is a limit beyond which no institution and no property can bear taxation."
McCulloch v. Maryland, 17 U.S. (1 Wheat.) 316, 327, 4 L.Ed. 579 (1819).
The preamble to the Alabama Constitution of 1901 echoes the Constitution of the United States in expressing one of its purposes as to "secure the blessings of liberty to ourselves and our posterity." Just like the Constitution of the United States and earlier colonial and state constitutions, the Alabama Constitution of 1901 specifies strict structural limits to the state's authority as one way to protect the people from the abuses of the state.
One such structural limit is a written enumeration of fundamental rights on which the state may not infringe because of their God-given, rather than man-conferred, nature. As the very first section of the Alabama Constitution of 1901 states, all men "are endowed by their Creator with certain inalienable rights . . . among [which] are life, liberty and the pursuit of happiness." Art. I, § 1, Ala. Const.1901.
Another structural limit to the state's authority designed to protect the people is a strict separation of powers among state governmental branches:
"In the government of this state, except in the instances of this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them. . . . "
Art. III, § 43, Ala. Const.1901.
Yet another structural limit is the express constitutional limitation on civil government administration, such as § 224 Ala. Const.1901, which states in part that "[n]o county shall become indebted in an amount . . . greater than five percentum of the assessed value of the property [in the county]."[46] This provision is before us *1097 today, due to Jefferson County's efforts to evade its constitutional limits through an elaborate debt and tax scheme.
B. The debates over the ratification of § 224 show that it was designed primarily to protect the rights of the people, not to bestow privileges on Alabama counties.
The record of the debates over the ratification of § 224 reveals that the delegates to the Constitutional Convention of 1901 chose to limit county government indebtedness to a maximum of 3.5 percent (later increased to 5 percent by Amendment No. 342) of the county's assessed property value, because they recognized that (1) debt issued for public works, together with (2) taxes levied to pay for that debt, hurts rather than helps the people, as the following dialogue between one delegate, Mr. Weakley, and a fellow unnamed delegate demonstrates:
"MR. WEAKLEY: . . . I was going to say that the reason counties should create debts are very few. They are to build court houses and jails, and bridges, and roads
"A DELEGATE: And poor houses?
"MR. WEAKLEY: And poor houses. And I will state further, that at the present rate we are contracting debts, we will have to build a few more poor houses in this country before very long."
2 Official Proceedings of the Constitutional Convention of 1901, p. 1451. Mr. Weakley recognized the close connection between government debt, taxes, and the poor house when he stated:
"It is recognized everywhere, as I said in the beginning, [a debt limit is] more important than the tax limit, because if the debt is not created the tax will not have to be levied to pay it."
2 Official Proceedings, p. 1451.
In a related matter, another delegate, a Mr. Sanford, spoke against the burden imposed on citizens when governments undertake overly ambitious public works:
"Men have houses in Montgomery for which they can never pay owing to the debts on them for pavements and sidewalks and tessellated streets, and Belgian blocks, and there is starving inside of their houses. And they call that benefiting the property! Every tile takes that much bread from the mouth of some man who works day after day for his daily bread. Why, only the other day a citizen said to me `Colonel, if they carry out their project of paving the streets as they are doing now, I will have to sell my house and move away because I will be unable to pay the cost of the benefits.' You take away the shelter of the poor man who works day after day for his daily bread and that of his family, and you take away all the hopes of his life. When he has made a little money and put in a homestead you come along and say `we will pave these streets with Belgian blocks and tessellated streets,' and for what? Simply in order that some gentleman from Boston may walk the streets and say what a beautiful town Montgomery is. That don't feed the poor man."
*1098 2 Official Proceedings, p. 1531.[47]
In fact, the drafters of the Alabama Constitution seemed to regard the strict written limits on county debt exemplified by § 224 as the flip side of the coin of strict written limits on civil government taxation, as a comment by a Mr. Harrison, another delegate, indicates:
"[W]e should come in with the strong arm of the fundamental law of the land and say thus far you shall go and no further. We have fixed the limit of taxation, and now we fix the limit beyond which you shall not incur any debts."
2 Official Proceedings, p. 1455.
C. This Court's precedents confirm that § 224 was designed primarily to protect the rights of the people rather than the spending privileges of Alabama counties.
The testimony of the Official Proceedings excerpted abovethat constitutional debt limits, like constitutional tax limits, were designed primarily to protect the peoplehas been recognized by this Court since shortly after the Alabama Constitution of 1901 was ratified. This Court has long
"understood and interpreted [that] the obvious intent of section 224 is to restrain counties from obtaining money either upon the general credit of the county, or by pledge or transfer of its revenue or assets, thereby creating a debt and imposing additional burdens upon the citizens, which, whether directly or indirectly, involve increased taxation."
Hagan v. Commissioner's Court of Limestone County, 160 Ala. 544, 554, 49 So. 417, 420 (1909). "[T]he purposes of these sections [§§ 224 and 225] are to curb the improvident creation of debts by cities and counties, thereby protecting the taxpayers against excessive and unnecessary burdens. . . ." Taxpayers & Citizens of the Town of Georgiana v. Town of Georgiana, 265 Ala. 654, 656, 93 So.2d 493, 495 (1956) (emphasis added). "[I]t is nevertheless well-settled that [the] underlying purpose [of the constitutional debt limit] is to serve as a limit to taxation, or stated otherwise, as a protection to the taxpayer." 265 Ala. at 657, 93 So.2d at 496 (emphasis added). "The intent behind the constitutional provision setting a debt limit for counties is to `curb the improvident creation of debts by counties, and thus protect the taxpayers against excessive and unnecessary burdens.' . . . An underlying purpose, implicit in the stated purpose, is to limit taxation. . . ." Eagerton v. Second Econ. Dev. Coop. Dist. of Lowndes County, 909 So.2d 783, 790 (Ala.2005) (quoting Hagan, 160 Ala. at 551, 49 So. at 419) (emphasis added). Even Taxpayers & Citizens of Shelby County v. Acker, the primary authority the majority opinion cites to support Jefferson County's debt-and-tax scheme, acknowledges: "The purpose of this provision [§ 224] is to curb excessive indebtedness by counties and thus protect the taxpayers against excessive and unnecessary burdens. . . . This provision is intended to limit the burden imposed upon taxpayers by new obligations. . . ." 641 So.2d 259, 261 (Ala.1994) (emphasis added).
Given the clear historic context, the strong historic record, and the overwhelming weight of this Court's precedents, I conclude that the primary purpose of § 224 was and is to protect the people from the burden of excessive county government *1099 debt and concurrent or resulting taxes. Unfortunately, the majority opinion ignores the weight of authority against it in concluding that § 224 was designed not so much to protect the people's freedom to conduct their business as to protect the government's ability to conduct its business: "[T]he drafters' purpose in including a debt limit in the Alabama Constitution was . . . to assure that the counties were able to pay the interests on their debts, . . . given the limits on their ability to tax." 954 So.2d at 1083 (footnote omitted). To be sure, maintaining a county's ability to keep up with interest payments was one purpose of § 224, but it was not the primary purpose. The primary purpose of the constitutional debt limit for Alabama counties was to protect the liberty of the people, who ultimately would have to pay that debt.
II. This Court should interpret § 224 according to the Court's long-standing plain-meaning rule of construction.
Constitutions, in order to effectively protect the rights of the people, must be accessible to them, or at least to the average educated citizen. Consistent with this purpose, "[a] constitution, properly conceived, deals with basic principles and policies, and omits specific applications," Eliasberg Bros. Mercantile Co. v. Grimes, 204 Ala. 492, 498, 86 So. 56, 58 (1920).
Thus, proper interpretation of a constitutional text must begin with the ordinary usage of the words of the text, which we call its "plain meaning." As this Court has explained with respect to statutory interpretation:
"`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"
Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)). Furthermore, Courts are "not at liberty to disregard or restrict the plain meaning of the provisions of the Constitution." McGee v. Borom, 341 So.2d 141, 143 (Ala.1976).
Thus, to properly interpret § 224, Ala. Const.1901, this Court must examine the language of § 224. Where plain language is used, this Court "`is bound to interpret that language to mean exactly what it says.'" Nielsen, 714 So.2d at 296 (quoting IMED, 602 So.2d at 346). If, and only if, the language of § 224 is found to be ambiguous may this Court take other factors into consideration to interpret the constitutional provision.
Given this Court's long-standing and proper practice of deferring to the plain meaning of the text of a constitutional provision whenever possible, one would expect the majority in this case to begin its interpretation of § 224 with a discussion of the plain meaning of the text. One would next expect the majority to find either that the plain meaning of the language of the text is unambiguous and apply it directly to Jefferson County's debt-and-tax scheme or to find that part or all of the text of § 224 is ambiguous and thus go beyond the text to resolve that ambiguity.
Unfortunately, the majority opinion in this case does not follow the plain-meaning rule in interpreting § 224 of the Alabama Constitution. This is a particularly telling omission, given that the majority opinion devotes several pages to applying the very same rule in historic context to a mere statute at issue in this case. See ___ So.2d at ___-___. Surely a constitutional *1100 provision is more important than a county tax-authorizing statute. Yet a plain reading of the majority opinion would lead one to conclude precisely the opposite.
But the failing of the majority opinion in this case is even more fundamental than its inversion of the respective places of a constitutional provision and a statute. Worse than that is the innovation of the majority opinion of following the plain-meaning rule closely when a challenge to the text threatens the power of the civil government but disregarding the plain-meaning rule when, as in this case, its application would tend to limit the power of the civil government. In so doing, the majority opinion subverts not only the constitutional text, but also the very purpose of the Alabama Constitution: to shield the people from the abuse of the State. This is why, as the majority opinion acknowledges, I "make[] much of" this Court's obligation to apply the plain-meaning rule to the constitutional text.
Although the majority opinion criticizes my application of the plain meaning rule to this case, it declines to apply the rule itself. Furthermore, it does so without first finding ambiguity in the constitutional text or without otherwise explaining why the plain meaning of the text need not govern in this case. Consequently, I see no reason not to conclude that the plain-meaning rule must govern the interpretation of § 224.
III. Under the plain-meaning rule of construction, Jefferson County's warrants constitute debt subject to the limits of § 224.
Section 224 of the Alabama Constitution 1901, as amended by Amendment No. 342, states:
"No county shall become indebted in an amount including present indebtedness, greater than five percentum of the assessed value of the property therein. Nothing herein contained shall prevent any county from issuing bonds, or other obligations, to fund or refund any indebtedness now existing or authorized by existing laws to be created."
(Emphasis added.)
On its face, § 224 prohibits a county from being "indebted" in an amount greater than five percent of the assessed value of the property in the county. Because nothing in the context requires a specialized or narrow interpretation of the term, the plain meaning of the word "indebted" (and "debt," an appurtenant term) controls, unless the word is ambiguous, and that plain meaning must be considered in determining whether the warrants issued by Jefferson County fall under the limits of § 224.
Noah Webster defined "indebted" as: "Being in debt; having incurred a debt; held or obliged to pay." American Dictionary of the English Language (Foundation for American Christian Education 1995) (1828). Webster defined "debt" as: "That which is due from one person to another, whether money, goods, or services." Id. Another, more modern dictionary defines "indebted" as "owing money," Merriam-Webster's Collegiate Dictionary 632 (11th ed.2003). It defines "debt" as: "2: something owed: obligation "; and "3: a state of owing [.]" Id. at 320. Thus the common understanding and usage of the words "indebted" and "debt" indicates an obligation, especially a financial obligation.
These ordinary usages of the terms "indebted" and "debt" have been recognized by courts across the country as applying to constitutional debt limits for civil government. For example, "`[I]ndebted' means brought into debt, being under obligation[.]" Words and Phrases, "Indebted; *1101 Indebtedness" (1959) (citing State v. Board of Trs. of Missoula County High Sch., 91 Mont. 300, 7 P.2d 543 (1932)). Furthermore, "Under constitutional provision[s] that no county shall become indebted in an amount including present indebtedness greater [the imposed limitation] of the assessed value of the property therein, a `debt' is an obligation to pay resulting from a law imposed duty or from contract express or implied authorized by law[.]" Words and Phrases, "Debt" (1959) (citing Wharton v. Knight, 241 Ala. 218, 2 So.2d 310 (1941)). Thus, the undisputed plain meaning of the words "indebted" and "debt" is an obligation by a party to pay.
In this case, the question is whether Jefferson County is the party obligated to pay the debt warrants or, as the majority opinion states, "whether Jefferson County has assumed additional debt." 954 So.2d at 1077. If so, the debt warrants must be chargeable to Jefferson County's constitutional debt limit.
As I see it, the party in this case is Jefferson County, which has obligated itself to pay the debt service on the warrants (and consequently has become "indebted") by assigning the proceeds of its targeted tax hike to pay for the debt warrants. The majority opinion attempts to avoid this conclusion by treating a limited obligation of Jefferson County as no obligation at all. According to the majority opinion, the "warrants are not a debt of Jefferson County" if (1) Jefferson County is not obligated to pay them out of "the general revenues that are available to it," and (2) if the revenue from the warrants "is not available to Jefferson County for general government purposes." 954 So.2d at 1077. In short, according to the majority opinion, Jefferson County is able to evade the constitutional debt limit by, in effect, accounting for the warrant debt "off the books."
Jefferson County's use of such accounting sleight of hand in an attempt to evade the constitutional debt limitation of § 224 violates the plain-meaning rule. The majority opinion has not shown anything in the text of § 224 that even suggests that the source of the money that will be used to pay the warrants, i.e., whether that source is from general funds or from special funds, is material. Furthermore, the majority opinion has not found the text of § 224 to be ambiguous. Consequently, the plain-meaning rule precludes this Court from redefining the Constitution to permit the extra debt from one county-funding source and to deny it from another.
The majority further attempts to avoid the logical consequence of proper application of the plain-meaning rule in this case by suggesting that the Court cannot interpret "indebtedness" in its ordinary sense because "then [counties] could [not] enter into many of the long-term contracts of employment or contracts for gasoline, electricity, or other goods and services necessary for a [county's] efficient, effective, and economic functioning." 954 So.2d at 1076 n. 23. This argument, however, is a red herring. Nothing in my opinion or in the text of § 224 suggests that counties may not enter into contracts for these purposes or that debt in general is precluded.
The plain meaning of § 224 is that it prohibits only debt that exceeds the overall debt limit, not contractual spending obligations arising out of the ordinary operations of local government. Long-term contracts of this type were not unknown to the drafters of § 224, and this Court has held since shortly after the ratification of § 224 that such contracts do not exceed the debt limit so long as their payment does not lead to an annual deficit. "[T]he inhibition against creating any new debt was never intended to prevent the county from contracting liabilities for current expenses *1102 in anticipation of its annual revenue, and which were to be paid from the revenue." State ex rel. Terrell-Hedges Co. v. Moody, 202 Ala. 444, 447, 80 So. 828, 831 (1919) (quoting Brown v. Gay-Padgett Hardware Co., 188 Ala. 423, 428, 66 So. 161, 162 (1914), quoting in turn Butts County v. Jackson Banking Co., 129 Ga. 801, 810, 60 S.E. 149, 153 (1908)). See also State ex rel Hyland v. Baumhauer, 244 Ala. 1, 12 So.2d 326 (1942) (citing Abrasley v. Jefferson County, 241, Ala. 660, 241 Ala. 660, 4 So.2d 153 (1941), and Brown v. Gay-Padgett Hardware Co., supra).[48]
It seems to me that the argument in the majority opinion here is ultimately no more than a public-policy argument that this Court must go along with Jefferson County's debt-and-tax scheme to evade the constitutional debt limit or else County functions will grind to a halt. Such a scenario is highly unlikely. But even if it were possible, it is not the place of this Court to decide that a political desire for a certain level of county government functioning, however conceived, overrides the plain-language constitutional debt limits: "In the decision of questions arising under these constitutional debt limits, considerations of policy have no place." James M. Gray, Limitations of the Taxing Power Including Limitations upon Public Indebtedness § 2055, p. 1051 (1906), quoted in Hagan, 160 Ala. at 551, 49 So. at 419.
Thus, if political considerations are put aside and the plain-meaning rule of interpretation is applied, the question of whether, in issuing the debt warrants and levying the targeted taxes at issue in this case, Jefferson County becomes indebted under § 224 must be answered in the affirmative. Moreover, because Jefferson County has become indebted in this manner, it has exceeded the debt limit permitted under § 224, and the decision of the lower court is due to be reversed.[49]
IV. This Court's precedents support the plain-meaning interpretation of § 224 that the debt created by Jefferson County's issuance of the warrants is subject to the constitutional debt limit.
The basic holding of Haganthat existing or future obligations that are funded by specially levied taxes are debt subject to § 224has been confirmed repeatedly and applied to a variety of circumstances. See, e.g., Gunter v. Hackworth, 182 Ala. 205, 62 So. 101, 102-03 (1913) (warrants issued by a county to repair county buildings and supported by specially levied taxes to fund the warrants were subject constitutional debt limit); Southern Ry. v. Jackson County, 189 Ala. 436, 66 So. 570 (1914) (debt incurred for the construction of a courthouse was subject to the constitutional debt limit because a special tax funded the debt); First Nat'l Bank of *1103 Abbeville v. Terry, Briggs & Co., 203 Ala. 401, 83 So. 170 (1919) (a special tax to fund construction was valid to the extent that the debt limit was not exceeded); Rollings v. Marshall County, 263 Ala. 317, 82 So.2d 428 (1955) (a special gasoline tax was authorized only if the debt limit was not exceeded); County Bd. of Educ. of Coffee County v. City of Elba, 273 Ala. 151, 135 So.2d 812 (1961) (a repayment contract by the city and the county board of education was void because of the debt limit); and Taxpayers & Citizens of Town of Georgiana v. Town of Georgiana, 265 Ala. 654, 93 So.2d 493 (1956) (issued warrants payable by a special tax caused the city to exceed its constitutional debt limit). See also Brown v. Gay-Padgett Hardware Co., 188 Ala. 423, 66 So. 161 (1914); O'Rear v. Sartain, 193 Ala. 275, 69 So. 554 (1915); Moody v. Gunter, 203 Ala. 655, 84 So. 831 (1919); Lawrence County v. Ayers, 229 Ala. 541, 158 So. 740 (1935); Littlejohn v. Littlejohn, 195 Ala. 614, 71 So. 448 (1916); Hall v. Blan, 227 Ala. 64, 148 So. 601 (1933); and Harman v. Alabama College, 235 Ala. 148, 177 So. 747 (1937).
Related to the plain-meaning rule as applied to debt-limit cases is the principle, reflected in precedents cited above, that "[t]he court should look to substance rather than mere form." This preference for substance over form is in the context of "a strict observance of th[e] constitutional debt limitation."[50]Taxpayers & Citizens of Shelby County v. Shelby County, 246 Ala. 192, 196, 20 So.2d 36, 39 (1944). That is why in prior cases this Court has consistently looked past ingenious methods or forms designed to evade the plain-language requirements of § 224.[51]
V. This Court's precedents for the past 100 years support the proposition that the warrants issued by Jefferson County are county debt in substance as well as form and are subject to the limits of § 224.
For almost 100 years, the rule for determining whether a warrant issue is within a constitutional debt limit has been as follows:
"If the fund from which the obligations are to be paid is to be created by the levy of a tax under the general power of taxation vested in the municipality, although the contract stipulates that no general indebtedness for the stipulated *1104 amount shall be created against the city, and that the only obligation undertaken by the city is to levy, anticipate, and pledge the tax agreed to be imposed, indebtedness is created, and the contract is void if the existing indebtedness of the municipality has been reached."
1 Dillon, Municipal Corporations § 198, p. 370 (5th ed.1911), cited in Town of Georgiana, 265 Ala. at 658, 93 So.2d at 497.[52] Moreover, this Court has held:
"The Constitution has also made a limitation on the amount of indebtedness which a county (§ 224) or a city (§ 225) may create.
"This has been construed to apply not only to an obligation to which the county or city pledges its full faith and credit, called a general obligation, but also when the county or city pledges existing property or revenue from existing sources to be derived in the future. . . . The full faith and credit of the county or city is not thereby pledged, but a part of it is pledged."
Norton v. Lusk, 248 Ala. 110, 117, 26 So.2d 849, 854 (1946).
In Hagan, the county incurred a contractual debt (similar in effect to a warrant) to fund the building of a new courthouse, and a special property tax was levied to pay for the debt. That debt was held to be subject to the constitutional limit. In Town of Georgiana, the town issued warrants to fund the construction of a public hospital, and a special tax was levied to pay for the warrants. The hospital warrants were held to be subject to the constitutional debt limit. In the present case, Jefferson County issued debt warrants to fund the county school system and special taxes were levied to pay for the debt warrants. Thus, the debt warrants issued by Jefferson County should be subject to § 224, under the consistent holdings of Hagan, Town of Georgiana, and their progeny.
VI. The majority's reliance on Acker is misplaced; Acker was wrongly decided and does not apply.
The majority opinion ignores nearly 100 years of consistent precedent striking down debt increases much like the debt issued by Jefferson County to seize on the single anomalous holding in Taxpayers & Citizens of Shelby County v. Acker, 641 So.2d 259 (Ala.1994), as the basis for its decision to uphold Jefferson County's debt hike. Ironically, although Acker was wrongly decided, as explained below, even if it were correct, the holding does not properly apply to the facts of this case.
A. Acker was wrongly decided and should be overturned
At issue in Acker was Shelby County resolution no. 93-12-2715 (later amended and superseded by resolution no. 94-02-12-10), which authorized the issuance of "`limited obligation refunding warrants.'" 641 So.2d at 260. Shelby County sought to issue these new warrants to refinance existing warrants, two series of which were revenue warrants, at lower interest rates. To finance these "limited obligation refunding warrants," Shelby County levied a special license tax "on persons engaged in the business of selling at retail in the *1105 County any tangible personal property or engaged in the business of conducting places of amusement or entertainment in the county, generally measured by the gross receipts of such business." 641 So.2d at 260.
The Acker Court recognized that "the [Shelby County] warrants are limited obligations of the County," 641 So.2d at 262, and did not dispute that taxpayers were under an increased burden as a result of the warrants. Thus, given the essential similarity of the particulars of Acker to those of prior constitutional debt-limit cases involving obligations and burdens imposed on the taxpayer, the Court should have applied its prior precedents to strike down the debt challenged in Acker.
Instead of striking down the Shelby County warrants, however, a bare majority of the Acker Court, over a strong dissent, held that if warrants are payable only by special taxes and the issuance of the warrants will not increase, and may actually reduce, taxes, then the warrants are not debt subject to the limitation of § 224. In effect, the Acker Court held that the plain meaning of § 224-an absolute prohibition on county debt over a specified level could be ignored so long as the intent of the constitutional provision, limiting the overall taxpayer burden, was honored:
"The purpose of this provision [§ 224] is to curb excessive indebtedness by counties and thus protect the taxpayers against excessive and unnecessary burdens. [Taxpayers & Citizens of the Town of Georgiana v.] Town of Georgiana, [265 Ala. 654, 93 So.2d 493 (1956)] (applying related provision of § 225 relating to municipalities). This provision is intended to limit the burden imposed upon taxpayers by new obligations and to stabilize the economic position of the county. Norton v. Lusk, 248 Ala. 110, 26 So.2d 849 (1946). It is directed against indebtedness and is not directed to purposes for which indebtedness is incurred. Wharton v. Knight, 241 Ala. 218, 2 So.2d 310 (1941). While courts must be careful to see that the indebtedness limitation is strictly observed, they should remember that the limitation is aimed at actual, rather than theoretical, indebtedness, and they should look to substance rather than mere form. Taxpayers & Citizens of Shelby County v. Shelby County, 246 Ala. 192, 20 So.2d 36 (1944)."
Acker, 641 So.2d at 261.
Such a holding is contrary to the Alabama Constitution and to this Court's long-applied principles of construction. Acker was wrongly decided, and it should be overruled. Although this Court has been reluctant to overrule prior decisions because of the need for stability in the law, we have held that there are circumstances under which we "should not hesitate" to depart from precedent:
"But where, as here, it is apparent that a holding which has been in the books only a comparatively short time and is clearly wrong, and upset a rule of long standing, we feel that this court should not hesitate to depart therefrom."
Redwine v. Jackson 254 Ala. 564, 574, 49 So.2d 115, 125 (1950). This is particularly true when the Constitution has been misinterpreted. Marsh v. Green, 782 So.2d 223, 232 (Ala.2000). Acker has been in existence only a comparatively short time; it is clearly wrong; and it presents an erroneous interpretation of a constitutional provision. Thus, we should not hesitate to overrule it.
B. Even if the holding in Acker were correct, it does not apply to the facts of this case.
But even if the holding in Acker did not conflict with the Alabama Constitution, it *1106 would still be improper to apply the Acker precedent to the facts of the case before us. This is so because, unlike the Shelby County warrants at issue in Acker, Jefferson County's debt-and-tax scheme does not, and will not under any circumstances presented to this Court, reduce the overall tax or debt burden of the people. Consequently, even under the authority cited by the majority opinion, the decision of the lower court in this case is due to be reversed.
VII. Conclusion
Although advanced in the name of "education" and promoted "for the children," Jefferson County's debt-and-tax scheme is contrary to the best interest of the very children it seeks to help because it burdens their future with debt beyond the protective limits established by the framers of the Alabama Constitution. Whether one considers the plain meaning of the text of the Constitution, the discussion of the delegates at the time of its ratification, the larger historic context, or 100 years of this Court's precedentsevery applicable authority supports the conclusion that Jefferson County's debt scheme is unconstitutional and thus void.

On Application for Rehearing
SEE, Justice.
APPLICATION OVERRULED; OPINION OF AUGUST 16, 2006, MODIFIED.
LYONS, HARWOOD, WOODALL, STUART, and SMITH, JJ., concur.
BOLIN and PARKER, JJ., dissent.
NABERS, C.J., recuses himself.
SEE, Justice (concurring specially).
The matters raised by the Chism plaintiffs on application for rehearing were fully addressed on original submission; therefore, I concur to deny the application for a rehearing.
This Court invites applications for rehearing because we are the court of last resort in virtually every case that comes before us. Rule 40(b), Ala. R.App. P., therefore states in relevant part: "The application for rehearing must state with particularity the points of law or the facts the applicant believes the court overlooked or misapprehended." The operative words are "overlooked" and "misapprehended." We grant application for a rehearing in a rather narrow range of cases. A rehearing is not an opportunity to raise new issues not addressed on original application. See Town of Pike Road v. City of Montgomery, [Ms. 1050151, Sept. 1, 2006] ___ So.2d ___, ___ (Ala.2006) (opinion on application for rehearing) ("As a general rule, the Court does not consider matters raised for the first time in an application for rehearing." (citing Morgan Keegan & Co. v. Cunningham, 918 So.2d 897, 908 (Ala.2005))); Riscorp, Inc. v. Norman, 915 So.2d 1142, 1155 (Ala.2005) (opinion on application for rehearing) ("`The well-settled rule of this Court precludes consideration of arguments made for the first time on rehearing.'" (quoting Water Works & Sewer Bd. of Selma v. Randolph, 833 So.2d 604, 608 (Ala.2002))); and Kirkland v. Kirkland, 281 Ala. 42, 49, 198 So.2d 771, 777 (1967) ("We cannot sanction the practice of bringing up new questions for the first time in application for rehearing."). Nor is an application for rehearing an invitation to reargue the issues already thoroughly considered on original application. See Willis v. Atlanta Cas. Co., 801 So.2d 837, 838 (Ala.2001) (overruling an application for rehearing when it was "simply an earnest reiteration of the appellant's original brief") (Johnstone, J., concurring specially). Instead, this Court invites an application for a rehearing so *1107 that we may be informed of a fact or a point of law that we have "overlooked" or one that we have "misapprehended."
The dissent to the denial of the application for a rehearing does not support any fact or point of law the applicants suggest this Court originally overlooked or misapprehended. Instead, it simply further elaborates on the position taken in the dissenting opinion on original consideration.
This case is one in which justice delayed is unquestionably justice denied. If Jefferson County cannot certify on or before October 20, 2006, that no litigation is pending challenging the validity of the education warrants, an "extraordinary mandatory redemption" of the warrants will occur; if, however, by October 20, 2006, Jefferson County can certify that no such litigation is pending, the proceeds of the education warrants remaining in the grant fund will be paid in the form of grants to 11 local school boards within Jefferson County, to be used by those boards for the construction or capital improvement of schools or to retire preexisting debt incurred by the boards for capital-improvement projects. Thus, if we have not finally resolved this matter by October 20, we have effectively decided this case against the appellees, who have prevailed as a matter of law both in the trial court and in this Court.
I believe the careful reader will see that the dissent to the denial of the application for rehearing incorrectly apprehends the main opinion; therefore, I do not believe it is necessary to engage with the dissent in a series of revisions and counter-revisions to our respective writings that will, at best, serve only to delay, and, at worst, to so delay as to eviscerate the relief granted by this Court.
PARKER, Justice (dissenting).
In seeking rehearing, the Chism plaintiffs argue that the majority opinion on original submission "ignores the plain meaning of 1901 Alabama Constitution, Section 224 . . . and misinterprets [this Court's precedents], produc[ing] an exemption that virtually swallows the constitutional debt limit" for counties. The Chism plaintiffs point out that the new approach sanctioned by the majority opinion, if sustained, "will allow counties and municipalities to evade debt limitations by the simple expedient of paying obligations from new special purpose taxes. . . ."
The Chism plaintiffs are correct. The majority opinion does effectively eviscerate the constitutional debt limitation of § 224. As a result, a county that wishes to increase its debt for any reason and to any degree will no longer find the constitutional restriction a limitation, provided only that the county is careful to create a new, targeted tax for each new debt. This is the logical and unavoidable consequence of the reasoning of the majority opinion.
The majority opinion has arrived at the point of effectively neutering a provision of the Alabama Constitution by fundamentally misapprehending Dillon on Municipal Corporations and the special-funds doctrine and misapplying Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966). I explain below and respectfully dissent from the denial of the application for rehearing.
A. Constitutional debt limitations are designed to protect the people from burdensome or ruinous taxation.
Section 224, Ala. Const.1901, creates a debt limit for counties similar to the debt limit for municipalities created by § 225, Ala. Const.1901. Because counties, like municipalities, are creations of the legislature, this Court has cited Dillon on Municipal *1108 Corporations in addressing the powers and authority of counties since before the adoption of the 1901 Constitution. See, e.g., Southern Ry. v. St. Clair County, 124 Ala. 491, 27 So. 23 (1899).
Judge Dillon says that "[t]he purpose of these constitutional [debt limitation] provisions is effectually to protect persons and property in municipalities from the abuse of the corporate credit and the consequent burdensome, if not ruinous, taxation." 1 John F. Dillon, Commentaries on the Law of Municipal Corporations § 191, at 342 (5th ed.1911)(footnote omitted; second emphasis added).
"While it is true that in terms `the limit provided by the Constitution is upon the power to contract indebtedness and not upon the power of taxation,' it is also true that taxation is the sting of indebtedness, and that the constitutional debt limit is provided because becoming indebted involves the exercise of the power of taxation if the municipal faith and credit are to be kept good."
1 Dillon on Municipal Corporations § 198, at 372 (footnote omitted; emphasis added).
Yokley states in his treatise on municipalities:
"It has been stated that the purpose of debt limitation statutes is to protect the taxpayer from confiscatory taxation. Enlarging on this principle, it might be stated that the purpose of debt limitation sections in constitutions [is] . . . to curb the improvident creation of debts by cities and counties, thereby protecting the taxpayers against excessive and unnecessary burdens, and to secure the credit of cities and counties to the end that they may borrow money, within the limits prescribed, on advantageous terms."
3 E.C. Yokley, Municipal Corporations § 579, at 505 (1958)(footnote omitted; emphasis added). Thus, according to the standard treatises on the subject, constitutional debt limits are ultimately designed to protect the people from what otherwise would often be ruinous levels of taxation.
B. The majority opinion mistakenly applies Dillon's provision for funding ordinary current expenses to the special-funds doctrine.
Because a county or municipality's tax revenues and its expenditures do not correspond exactly each month, Dillon recognizes that compensating for this by anticipating revenues does not implicate the constitutional debt restrictions. Although the majority opinion quotes from Dillon's discussion on this topic, in § 194, it omits some of the relevant language; so I quote more fully (and indicate material quoted by the majority in bold typeface) below:
"§ 194. Anticipation of Revenues. When a city has become indebted to the limit permitted by the Constitution, the municipal officers are confronted with the difficulty of providing for ordinary current expenses before the receipt of the revenues of the current year. To enable a city to meet these expenses, the rule has been recognized that the municipality may, to a certain extent, anticipate its revenues, and the liabilities thus incurred in anticipation of these revenues are not debts within the meaning of the Constitution. But in order to take these liabilities out of the operation of the Constitution, the tax anticipated must have been actually levied or at least leviable for the current year at the time when the obligation is incurred, and it has been declared in certain cases that the legal effect of the contract or obligation must be that the creditor agrees to look only to the revenues so anticipated for payment. In other words, the contract or agreement must be in effect an assignment of taxes actually levied without recourse against the *1109 assignor. And the fact that the revenue so anticipated and pledged to the payment of these obligations is wrongfully diverted to other uses does not bring the debts thereby created within the constitutional provision. But the rule that current revenues may be anticipated must not be so far relaxed as to impair the force of the constitutional provision, or nullify its spirit. The only revenues which can be anticipated in this manner are those accruing from the collection of taxes already levied or at least leviable for the current year. Any anticipation of the revenues in excess of the amount covered by the annual levy is illegal. Hence a statute which authorizes the municipality to levy a specified tax yearly for a period of ten years and empowers the local authorities to make the levy for the whole period, and to draw anticipation warrants against the aggregate amount to be produced by the tax based on the assessment of the previous year, is an attempt to authorize the municipality to become indebted beyond the constitutional limit and is invalid. But these anticipations are to be carefully distinguished from the anticipation and pledge of revenues to be created under a special assessment to pay for the particular improvement out of which the debt arises. The qualifications upon the anticipation of revenues apply only to revenues to be raised by taxation for the general purposes of the municipality, and not to special assessments, the proceeds of which are specifically devoted to the improvement in connection with which the indebtedness is created. As shown elsewhere, obligations charged and chargeable solely under legislative authority upon and payable exclusively from a special fund to be created by the levy of a special assessment or other special fund do not come within the constitutional prohibition."
1 Dillon on Municipal Corporations § 194, at 354-55 (footnotes omitted; second emphasis and bold typeface added).
In this section on "Anticipation of Revenues," Dillon expressly deals with "ordinary current expenses." He makes it clear that the revenues that may be anticipated for the payment of ordinary current expenses are limited:
"The only revenues which can be anticipated in this manner are those accruing from the collection of taxes already levied or at least leviable for the current year. Any anticipation of the revenues in excess of the amount covered by the annual levy is illegal."
1 Dillon on Municipal Corporations § 194, at 355 (footnotes omitted). Dillon further cautions that "the rule that current revenues may be anticipated must not be so far relaxed as to impair the force of the constitutional provision, or nullify its spirit." 1 Dillon on Municipal Corporations § 194, at 355 (emphasis added). Yet that is the precise result of the majority opinion in this caseit "produc[es] an exemption that virtually swallows the constitutional debt limit."
It is a mistake to apply § 194 of Dillon on Municipal Corporations, addressing "ordinary current expenses," to the special-funds doctrine, discussed infra. The error of this application of § 194 may be seen by reviewing the internal footnotes omitted from the majority's excerpt from Dillon on Municipal Corporations. Here is the quoted text with its footnotes:
"The qualifications upon the anticipation of revenues apply only to revenues to be raised by taxation for the general purposes of the municipality, and not to special assessments, the proceeds of which are specifically devoted to the improvement in connection with which the indebtedness is created.6 As shown elsewhere,7 obligations charged and *1110 chargeable solely under legislative authority upon and payable exclusively from a special fund to be created by the levy of a special assessment or other special fund do not come within the constitutional prohibition.
"6 Com'rs of Highways v. Jackson, 165 Ill. 17, 45 N.E. 1000, aff'g 61 Ill.App. 381; Windsor v. Des Moines, 110 Iowa 175, 81 N.W. 476; State v. Superior Court of Whatcom County, 42 Wash. 521, 85 P. 256.
"7 Post, § 198."
Footnote 6 cites capital-improvement cases involving a municipality's construction of roads (Comm'rs of Highways v. Jackson, 165 Ill. 17, 45 N.E. 1000 (1897), and State v. Superior Court of Whatcom County, 42 Wash. 521, 85 P. 256 (1906)). and a utilities plant (Windsor v. Des Moines, 110 Iowa 175, 81 N.W. 476 (1900)). In Windsor, the Iowa Supreme Court held invalid the payment plan for the construction of a municipal electric plant because it was to be paid for by a special tax levy instead of from the revenues produced by the plant. In Whatcom County, "the city [was] to pay for property taken by special assessments made upon property benefited. . . ." 42 Wash. at 526, 85 P. at 258. Footnote 7 refers to Dillon on Municipal Corporations § 198, which is entitled "Obligations Payable only from a Special Fund." An examination of Dillon on Municipal Corporations § 198, infra, shows the misapplication by the majority opinion of the quotation from Dillon on Municipal Corporations § 194.
C. Dillon on Municipal Corporations § 194 applies only to ordinary current expenses, which are not at issue in this case.
The "ordinary current expenses" referred to in Dillon on Municipal Corporations § 194 are defined in § 195:
"The current expenses which may be lawfully incurred without violating the Constitution have been held to include salaries to the sheriff, register, and clerk of a county; salary due an alderman; services for jurors in the superior court, witness fees in criminal proceedings, sheriff's expenses in serving criminal process, and expenses incurred at the general State election, as being necessary expenses made mandatory in the Constitution, and provided for by the legislature of the State, and imposed upon the county; salaries of policemen, marshal, and city treasurer; the rent of suitable offices for the officers of a city; labor and material furnished in the building of a city jail; services in guarding quarantine patients, publishing notices and printing ballots of election, feeding impounded stock, boarding city prisoners; insurance on city buildings; services in making assessment rolls; postage and stationery for officers, city printing, the necessary expenses of the city clerk, the fee of an architect employed by the city to prepare plans and specifications of a city hall and market house, the expense of an investigation of county books, the expense of light, water, labor, and the like; but the building of a sewer system is not to be regarded as a current expense, nor is the building of a garbage crematory and the purchase of a site therefor; and the erection of a city hall, or a building for the use of the city officers, is an extraordinary expense, and not an ordinary and necessary expense such as is properly payable from current revenues."

1 Dillon on Municipal Corporations § 195, at 357-58 (some emphasis original; some emphasis added). As the last emphasized text makes clear, capital improvements such as the construction of state *1111 school facilities are not current expenses. Therefore, the text quoted by the majority opinion from § 194 does not support its holding.
D. The special-funds doctrine also does not provide support for the majority opinion.
Dillon discusses the special-funds doctrine and its limitations in § 198:
"§ 198. Obligations Payable only from a Special Fund.In the case of streets, sewers, and other local improvements, which are payable from the proceeds of special assessments upon the property benefited thereby, a contract which provides that the contractor shall be paid from such assessments, that he shall have no right of recourse against the municipality or its property, or its general power of taxation, and that the only duty of the municipality shall be to levy, collect, and pay over the special assessments, does not create any indebtedness on the part of the municipality within the meaning of the constitutional limitation, although the city is a party to the contract, although the money is payable through its general treasury, and although it issues certificates, warrants, or bonds payable out of such special fund for the payment of the cost of the improvement. Under such a contract no judgment in personam against the city for non-payment of the cost is justified, no charge can be enforced against its general assets, nor can a resort be had to general taxation for the purpose of satisfying the claim. When the rights of the contractor are so limited, there is no debt within the debt-limit provision of the Constitution."
1 Dillon on Municipal Corporations § 198, at 368 (footnote omitted). The special fund is created by "collecting from the parties benefited the amount of the special assessment." 1 Dillon on Municipal Corporations § 198, at 369.
"This `special fund' exception to a constitutional limitation on municipal debt is normally applied in situations where a city's indebtedness is for the purpose of building or buying revenue-producing property, and only the revenue produced from that particular property is used to repay the indebtedness."
56 Am.Jur.2d Municipal Corporations, Counties, and Other Political Subdivisions § 598, at 612 (2000)(footnotes omitted).
"Generally, debts secured by special assessments, as authorized by statute, do not constitute debt under a constitution debt limitation as they are incurred for special improvements, financed by a special tax on properties they benefit and do not burden any property of the municipality other than the revenues from the special assessment tax pledged as repayment."
56 Am.Jur.2d Municipal Corporations, Counties, and Other Political Subdivisions § 599, at 613 (footnote omitted).
Earlier decisions of this Court have been in accord with this application of the purposes and limitations of the special-funds doctrine:
"Under these authorities and others, however, the county or city does not pledge its faith or credit when the indebtedness incurred to purchase or develop new property or facilities is made repayable solely out of the income to be derived from such property or facilities. We have said that such an obligation by a county or city does not create a debt within the meaning of §§ 224 or 225. Those provisions of the Constitution were intended to limit the burden imposed upon taxpayers by new obligations, and to stabilize the economic position of the institution.

*1112 "But whether a given status or obligation is a debt under the Constitution so restricting the institution has relation to the purpose to be accomplished. It may not be a debt such as is contractable as an absolute obligation to pay, pledging the faith and credit of the State, or the institution, yet nevertheless could be a debt in a sense that it is an obligation due from the institution to the payee to see that the transaction is executed according to agreement. `Debt' is defined as: `That which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another or to perform for his benefit; thing owed; an obligation or a liability.' Webster's New International Dictionary, Second Edition."
Norton v. Lusk, 248 Ala. 110, 117, 26 So.2d 849, 854 (1946). Amendment No. 398, Ala. Const.1901, now expressly provides that revenue bonds for the construction of public utilities "payable solely out of revenues derived from the operation of any one or more of such systems" are not constitutional debt within § 224.
E. A special fund cannot be funded from general taxes.
A capital improvement that benefits all is to be paid for out of the general taxing power of the municipality, in contrast to a local improvement, which is to be paid for by special assessment against just those benefited:
"But where the improvement is one which affects the welfare of the city at large and is not properly payable from a local assessment, different considerations arise. The city then is acting for the whole body of the people, and all the citizens receive the benefit of the improvement. A tax made for the improvement must, in justice, be laid upon the whole taxpayers of the body corporate, and if the improvement is to be paid for by taxation, recourse must be had to the general exercise of the power of taxation of the municipality."
1 Dillon on Municipal Corporations § 198, at 369. But when the general taxing authority is resorted to, it creates debt within the meaning of the constitutional limitation:
"If the fund from which the obligations are to be paid is to be created by the levy of a tax under the general power of taxation vested in the municipality, although the contract stipulates that no general indebtedness for the stipulated amount shall be created against the city, and that the only obligation undertaken by the city is to levy, anticipate, and pledge the tax agreed to be imposed, indebtedness is created, and the contract is void if the existing indebtedness of the municipality has reached the constitutional limit."
1 Dillon on Municipal Corporations § 198, at 370 (footnote omitted). See Windsor, supra.
Other authorities agree:
"The weight of authority, and it seems to the writer of reason, supports the view of the Circuit Court of Appeals, that a municipality indebted to the limit cannot evade the constitution and incur further debt by creating a `special fund' to pay the debt, when such special fund has its source in general taxation of the community."
James M. Gray, Limitations of the Taxing Power, Including Limitations Upon Public Indebtedness § 2107, at 1083 (1906) (footnoted omitted).
"(b) Exceptions to debt limitation requirements; special fund doctrine.As a general proposition, constitutional provisions on debt limitation are not violated by the issuance of bonds of a revenue *1113 character or other obligations which are payable solely from a special fund, provided the governmental body is not liable to maintain the special fund out of its general funds, or by tax levies, should the special fund prove insufficient."
Yokley, § 579, at 505-06 (footnote omitted).
"If an obligation is payable out of a special fund only, and the municipality is not otherwise liable, it is generally held that there is no indebtedness. In other words, if the municipality is not liable to maintain the special fund out of its general funds, or by tax levies, should the special fund prove insufficient, the obligations are not considered an indebtedness within the constitutional limitations."
15 Eugene McQuillin, The Law of Municipal Corporations § 41:30, at 500-01 (3d ed.2005) (footnotes omitted).
"Where municipalities have been indebted in excess of their debt limit, or very close to the boundary line, attempts to evade the debt-limit provision by providing for a special levy of taxes or a levy for a period of years to pay the liability sought to be created have generally been unsuccessful."
15 McQuillin, § 41:34, at 523 (footnote omitted).
"Thus, an ordinance for the levy of a tax of one percent for a certain number of years to pay water bonds to be issued, creates a debt so as to be invalid where the municipality is already indebted beyond the constitutional limit, notwithstanding the bonds were to be payable solely out of a special tax levy, and the net revenue of the waterworks."
15 McQuillin, § 41:34, at 525 (footnote omitted).
"Although a municipal corporation has exceeded the debt limit, it may generally contract a debt payable out of a special fund or payable out of the proceeds of a special assessment; but an obligation payable out of a fund which is the product of a tax levy or out of a fund which must be replenished by funds raised by taxation is generally held a debt within the limitation."
64A C.J.S. Municipal Corporations § 1590, at 129 (1999).
"Some authorities have held that any obligation paid or contracted to be paid out of a fund which is the product of a tax levy is a debt within the purpose of the constitutional limitation; and under this view a municipality which has reached the constitutional limit of indebtedness cannot create a debt to be paid directly or indirectly, in whole or in part, from funds raised by taxation, or from a fund which must be replenished by funds raised by taxation. An indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated."
64A C.J.S. Municipal Corporations § 1590, at 129-30 (footnotes omitted). Because Jefferson County does resort to its general taxing authority, it is properly subject to the constitutional debt limitation.
F. The misapplication of Edmonson to the special-funds exception.
The majority opinion relies on Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966), as follows:
"In Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966), this Court identified seven characteristics of statutory funding *1114 mechanisms it had previously upheld as not creating or incurring a `debt' under the constitutional debt limit applicable to the State:
"`(1) Each [of the statutes] provides that the bonds authorized to be issued thereunder shall not be general obligations of the issuing body but shall be payable solely out of the funds appropriated and pledged under the provisions of the applicable act;
"`(2) Each [of the statutes] provides that the bonds authorized to be issued thereunder shall not constitute or create an obligation or debt of the State of Alabama;
"`(3) Each [of the statutes] appropriates and pledges for the accomplishment of the purposes thereof so much as may be necessary of receipts of an excise tax of the State of Alabama;
"`(4) In none of the statutes was there any representation or agreement of any kind that there would ever be any receipts from the tax pledged or that the receipts, if any, would be sufficient to service the bonds;
"`(5) In none of the statutes was there either a pledge of the faith and credit of the State or an agreement to pay the appropriation from any other funds if those appropriated should be insufficient to service the bonds;
"`(6) Each of the statutes authorized the use of proceeds of the bonds issued thereunder for a purpose of state-wide interest;
"`(7) Each of the statutes appropriated and pledged for the servicing of the bonds the receipts of a special tax which had not theretofore been paid into the general fund of the State.'
"279 Ala. at 211, 184 So.2d at 119-20. The issue in this case is whether the fact that the special tax pledged is a new revenue source not otherwise available for general purposes exempts the education warrants from being charged against Jefferson County's constitutional debt limit. We noted in Opinion of the Justices No. 346, 665 So.2d 1357 (Ala. 1995), that, pursuant to Edmonson, it is critical to a finding that warrants do not constitute debt chargeable against the State's debt limit that they be serviced by a new revenue source that would not otherwise be available for the general fund. In Opinion of the Justices No. 346, the Justices expressed their opinion that a proposed bond issue by the Alabama Incentives Financing Authority would be included in the State's constitutional debt limit `because it does not create a new revenue source to retire the bonds . . . but attempts to divert funds that heretofore have been, and, by constitutional provision, must be paid into the General Fund.' 665 So.2d at 1362. In so concluding, the Justices noted: `[C]ritical to the Edmonson holding is the fact that the bonds were to be retired by a new revenue source, one that had not theretofore been payable to the General Fund.' 665 So.2d at 1362."
954 So.2d at 1084-85 (footnote omitted). The Court in Edmonson deduced the seven principles from three case that involved not the State of Alabama, but public corporations:
"We now consider whether the appropriation and pledge in the act for servicing the bonds creates a new debt under Section 213, as amended. We hold that they do not under the authority of Rogers v. Garlington, 234 Ala. 13, 173 So. 372 [(1937)]; Opinion of the Justices [No. 174], 275 Ala. 254, 154 So.2d 12 [(1963)]; Opinion of the Justices [No. 169], 270 Ala. 147, 116 So.2d 588 [(1959)]. In Rogers v. Garlington, supra, *1115 there was an appropriation and pledge of the state gasoline tax to pay bonds of the Alabama Bridge Authority; in the opinion in [Opinion of the Justices No. 174,] 275 Ala. 254, 154 So.2d 12 [(1963)], the appropriation and pledge were for bonds issued by the Alabama Trade School and Junior College Authority; and in the opinion [in Opinion of the Justices No. 169], 270 Ala. 147, 116 So.2d 588 [(1959)], the pledge and appropriation were for bonds issued by the Alabama Education Authority. In each of the statutes under consideration there, and Act No. 662 here, there were striking and substantial similarities. . . . "
Edmonson, 279 Ala. at 211, 184 So.2d at 119. Rogers involved the Alabama Bridge Authority; Opinion of the Justices No. 174 involved the Alabama Trade School and Junior College Authority; and Opinion of the Justices No. 169 involved the Alabama Education Authority. Because these were all public corporations, they were not subject to the debt prohibition applicable to the State in § 213 of the Alabama Constitution.
By taking the Edmonson principle of a "new revenue" source, expressed as "the receipts of a special tax which had not theretofore been paid into the general fund of the State," applicable to a public corporation that has no constitutionally imposed debt limit, and applying it to counties which are subject to constitutional debt limits, the majority opinion has gotten off track. In fact, even the out-of-state authority cited by the majority opinion also applies only to public corporations.[1] Although previous decisions by this Court have referred to the "new revenue" principle (see, e.g., Opinion of the Justices No. 346, 665 So.2d 1357, 1362-63 (Ala.1995); Eagerton v. Second Econ. Dev. Coop. Dist. of Lowndes County, 909 So.2d 783, 792 (Ala.2005)), the majority opinion in this case now expands it beyond its proper limitation to public corporations. The result is not only an end-run around the constitutional debt limitation of § 224 but also, as the Chism plaintiffs point out, a complete end to any effective constitutional restrictions on county debt as required by § 224.
Accordingly, I respectfully dissent from the recommendation to overrule the application for rehearing.
NOTES
[1] This case was originally assigned to another Justice on 1 this Court and was reassigned to Justice See.
[2] Ordinance no. 1769 levies a "privilege or license tax . . . on the gross receipts of retail sales in the County pursuant to the authority of Code of Alabama 1975 § 40-12-4" and an "excise tax . . . on the storage, use or other consumption in the County of tangible personal property purchased at retail pursuant to the authority of Code of Alabama 1975 § 40-12-4."
[3] The Chism plaintiffs complain in the statement of facts in their brief to this Court that these obligations were issued and sold by Jefferson County on a privately negotiated noncompetitive basis, without obtaining or seeking approval of the voters or of the Governor, and without the County's availing itself of a preissuance judicial ruling through a validation proceeding provided for by Ala. Code 1975, § 6-6-750. Jefferson County states, however, that, pursuant to Regulation 290-1-2-01.01, Ala. Admin. Code (State Board of Education), the State superintendent of education reviewed and approved the sale and issuance of the education warrants. In any event, the Chism plaintiffs do not contend that defective preissuance approval is a basis for holding the education warrants invalid.
[4] We do not note the fact that the local boards have agreed to the plan as a reason for holding that the plan of distributing the taxes is valid. Instead, we note their agreement in response to the argument that the plan of distribution deprives the local boards of the ability to decide how the education taxes are spent.
[5] Thus, with the involvement of the local boards and the State superintendent, the issuance of the education warrants is not, as might be inferred from Justice Bolin's dissent, a unilateral action by Jefferson County. However we might feel about who should have the ultimate power to decide whether to impose the tax, the legislature has left that decision to the counties, and it is to be expected that Jefferson County would exercise as well its obligation to weigh the benefits and burdens to the County of imposing the education taxes and issuing the education warrants.
[6] Jefferson County received a total of $1,090,820,599.59 from the sale of the warrants. Jefferson County established prescribed reserves with almost $59 million, and paid fees, discounts, and expenses of underwriters, attorneys, advisers, and others, with over $14 million. The balance  $1,017,609,801.74  was paid into the grant fund to be used for grants to specified local school boards for certain public school purposes or to pay part of the costs of redeeming the warrants in the event of an "extraordinary mandatory redemption." These funds are being held by Wachovia Bank (as successor to SouthTrust) in special escrow and trust accounts pending the outcome of this litigation.
[7] The Chism plaintiffs complain that this plan prevents local school boards from deciding how best to spend their shares of the grants funded by the new taxes, that the taxes will not be divided among the local school boards based on their changing student enrollments during the period the tax is levied, and that any new school systems formed during the period the tax is levied will not receive a share of the taxes collected. For example, the Chism plaintiffs point to the Trussville Board of Education, which, because it was only recently formed, had no students in 2003 and, thus, is not entitled to any portion of the proceeds in the grant fund. A separate agreement was entered into whereby the Jefferson County Board of Education agreed that the Trussville Board of Education should receive an appropriate share of the grant proceeds. The Chism plaintiffs assert, however, that, if a local school board is formed after the proceeds in the grant fund have been distributed, that solution will not be available.
[8] The Chism plaintiffs contend that no other county with more than one local school board has ever levied a tax under § 40-12-4 without distributing the revenues collected to the local school boards in proportion to their respective annual Foundation Program cost. Jefferson County does not dispute this contention.
[9] At oral argument, counsel for the Chism plaintiffs explained,

"Subsection [40-12-4](b) modified [§ 40-12-4(a)] by requiring in counties with more than one board of education that the funds be distributed to the various local boards. Now, in Mobile you could use that and not have to distribute to the local boards because there's only one local board. But where you have more than one [local board] you have to do it that way and that is what has happened."
Justice Bolin, in his dissent, argues that, even if counsel did concede this point, counsel was wrong as a matter of law. Justice Bolin states: "Assuming that the Chism plaintiffs conceded this example, a party cannot agree to an erroneous principle of law or statutory interpretation." 954 So.2d at 1093-94 (footnote omitted). However, the language of the statute, far from contradicting the concession, compels it: "In all counties having more than one local board of education, revenues collected under the provisions of this section shall be distributed within such county on the same basis of the total calculated costs for the Foundation Program for those local boards of education within the county." § 40-12-4(b) (emphasis added).
[10] The Chism plaintiffs point to the Trussville Board of Education as offering a particularly troublesome example. It was only recently formed, had no students in 2003, and thus is not entitled to any portion of the proceeds of the grant fund. A separate agreement was entered into whereby the Jefferson County Board of Education agreed that the Trussville Board of Education should receive an appropriate share of the proceeds of the grant fund. The Chism plaintiffs state, however, that, if a new board is formed after the proceeds in the grant fund have been distributed, that solution will not be available for that new board. The Chism plaintiffs specifically reference Fultondale, Gardendale, and Pleasant Grove as potential new school districts.
[11] The interpretation of § 40-12-4 Jefferson County urges on appeal is consistent with ordinance no. 1769. Section 2 of ordinance no. 1769, "Legislative Findings," explains Jefferson County's rationale for its plan:

"(b) . . . Since it is entirely within the discretion of the County Commission as to whether any tax will be levied pursuant to Section 40-12-4, and since the elected members of the Commission are politically accountable for the proper and effective expenditure of the proceeds of such tax, the commission has determined that Section 40-12-4 empowers the County to use the proceeds of the Education Taxes to pay debt service on the Education Warrants, provided that the proceeds of such warrants are either distributed to boards of education in the County in proportion to the costs of their Foundation Programs during the fiscal year in which such warrants are issued or, alternatively, are directly expended by the County for school purposes in the territorial jurisdictions of such boards of education in proportion to such costs of the Foundation Programs."
[12] Taxing statutes or ordinances are to be construed strictly against the taxing authority and in favor of the taxpayer. However, we explained in Brown v. Board of Education of Montgomery that the rule regarding strict interpretation in favor of the taxpayer applies only when a "taxing statute" or ordinance is being interpreted and that § 40-12-4 is not a "taxing statute" in that it does not levy a tax. Instead, we said, § 40-12-4 merely authorizes the counties to enact ordinances to levy taxes. 863 So.2d at 75 n. 3. In this case, we are not interpreting ordinance no. 1769, the taxing ordinance; instead, the Chism plaintiffs' argument requires us to interpret § 40-12-4.
[13] Thus, this case is not inconsistent with our decision in Brown v. Board of Education of Montgomery County, supra, in that the proviso relevant to that case explicitly prohibits the tax that was there imposed.
[14] We note that the local school boards have agreed to the tax revenues being spent in this way. Thus, using the tax revenues to pay the debt service on the education warrants could be viewed as a payment to the local school board in the form of payment of its share of the debt service.
[15] Alabama Code 1975, § 40-12-4, was subsequently amended in 1969 by Act No. 69-688, Ala. Acts 1969; that amendment is not pertinent to this case.
[16] The Chism plaintiffs agree that local school boards can issue warrants themselves and pledge the taxes a county is authorized to levy under § 40-12-4 to service the debt created by the issuance of the warrants. Jefferson County contends that the single large financing by the County had several advantages over smaller financings by the individual local school boards. It made it possible to structure part of the debt with a variable rate of interest and thereby to obtain a composite interest rate lower than would have been possible if the entire debt had been legally required to bear a fixed rate of interest. Jefferson County contends that Ala.Code 1975, § 16-13-70, the only statute that permits local school boards to issue warrants payable out of taxes levied by § 40-12-4 requires the public sale of warrants under conditions that do not permit variable interest rates.
[17] Therefore, the value of such investments does not walk in lockstep with growing or declining enrollments in the school district in which the investment is made.
[18] For a county with only one local school board, the reference in § 40-12-4(b) to "all counties having more than one local board of education" and to the Foundation Program as a means of distributing funds does not come into play.
[19] Justice Bolin argues in his dissent that, pursuant to Brown v. Board of Education, the language in § 40-12-4(b) concerning "counties having more than one local board of education" "trumps" the provisions of § 40-12-4(a). 954 So.2d at 1092. However, what Brown said is that the statement in § 40-12-4(b)  "Notwithstanding anything to the contrary herein, said governing body shall not levy any tax hereunder measured by gross receipts, except a sale or use tax which parallels, except for the rate of tax, that imposed by the state under this title"trumps anything in § 40-12-4(a) that might allow such a tax. 863 So.2d at 77. There is no argument made in this case that Jefferson County lacks the authority to levy the education taxes.
[20] The Chism plaintiffs contend that no county has previously issued warrants under Ala. Code 1975, § 11-28-1 et seq., to make grants to local school boards for the purpose of constructing schools that are not and will not be owned by the county issuing the warrants or to retire debts of the local school boards. Chism plaintiffs' brief, p. 49. The Chism plaintiffs explain, however, that several counties have issued warrants under Ala.Code 1975, § 11-28-1 et seq., to obtain funds to purchase school buildings from a board of education in a sale-and-lease-back transaction. The Chism plaintiffs state that this type of warrant "obviously" satisfies the "acquisition requirement of § 11-28-1." However, they state that it has not been authoritatively determined whether such a transaction also satisfies the requirement that the facilities acquired are "needed for the performance of governmental functions and responsibilities of such county." Chism plaintiffs' brief, p. 49 n. 23.
[21] In doing so, we are mindful that a constitution creates a government. If a constitution is intended to be more than mere rhetorical flourish, it bestows upon the government it creates the power to do that which it calls upon the government to do. "In a government framed for durable liberty, not less regard must be paid to giving the magistrate a proper degree of authority, to make and execute the laws with rigour, than to guarding against encroachments upon the rights of the community. As too much power leads to despotism, too little leads to anarchy, and both eventually to the ruin of the people." Alexander Hamilton, 2 Papers of Alexander Hamilton 650-51 (Harold C. Syrett et al., eds., 1978).
[22] The Alabama Constitution establishes debt limits for three governmental entities: § 213 establishes the debt limit for the State; § 224 establishes the debt limit for counties; and § 225 establishes the debt limit for municipalities.
[23] Justice Parker, however, must explain how, under his "plain meaning" definition of the word "debt," municipalities could enter into many of the long-term contracts of employment or contracts for gasoline, electricity, or other goods and services necessary for a municipality's efficient, effective, and economical functioning. All such contracts fall within one of Webster's definitions of debt, which Justice Parker's dissent synthesizes as follows: "Thus the common understanding and usage of the words `indebted' and `debt' indicates an obligation, especially a financial obligation." 954 So.2d at 1100. Interestingly, Justice Parker's response to this question is not to explain why these long-term obligations to pay do not fall within the plain meaning of the word "debt," but instead to offer that, "This Court has considered the issue of long-term contracts for ordinary civil government operations in prior cases and has held that such contracts do not exceed the debt limit so long as their payment does not lead to an annual deficit." Indeed, that is the common understanding of the term by courts. See, e.g., Winkler v. State School Bldg. Auth., 189 W.Va. 748, 434 S.E.2d 420 (1993) (citing cases holding that a constitutional limitation barring the creation of indebtedness for future legislatures did not include contracts necessary for government functioning, including the pension system, which was funded by general revenues, rental leases, and energy-supply contracts); and Eakin v. State ex rel. Capital Improvement Bd. of Managers of Marion County, 474 N.E.2d 62, 65 (Ind.1985) ("There are a number of financial liabilities in the public domain which are not included in the term `indebtedness' of Article 13.") Nor is the term "debt" unusual in this regard. See, e.g., Harris v. United States, 447 F.Supp.2d 208, 211 (D.Conn.2005) ("Confusingly for non-lawyers and pro se plaintiffs, the phrase `case or controversy' as used in the Constitution has a specialized meaning that is different from the everyday use of those terms: it is really shorthand for `the kind of dispute suitable for resolution through the courts rather than the political process.'"). See also Ex parte Lange, 85 U.S. (18 Wall.) 163, 201, 21 L.Ed. 872 (1873) ("What is meant by the phrase `twice put in jeopardy of life or limb' has been judicially defined, and the definition cannot now be enlarged to help out a predetermined unsound judicial conclusion."). However, we do not raise the question of what is "plain meaning" and how is it to be reconciled with these cases; that question is raised, yet unanswered, by the dissenting opinion.
[24] Although we accept, for purposes of this analysis, Justice Parker's own expansive definition of "indebted," he is not satisfied. Also puzzling is the dissent's use of such terms and phrases as "off the books," "sleight of hand," "evade," "redefining the Constitution," and "[t]he majority opinion's final effort to avoid," which do not add to the analysis.
[25] See, e.g., Tribe v. Salt Lake City Corp., 540 P.2d 499, 503 (Utah 1975)("The Act specifically provides that the bonds and other obligations of the agency are not a debt or obligation of the community (which is defined in the Act as a city, county or combination of the two), the state, or any of its political subdivisions. In addition, the enabling statute, the proposed bond resolution, the proposed bond form, and the city ordinance of ratification all prohibit the use of credit of the city for the repayment of the bonded indebtedness. The bondholders can look only to revenues from the operation of the facility and the allocated taxes, for retirement of the bond obligation. Under the subject statute, providing for this arrangement, there can be no city debt created contrary to Article XIV, Sections 3 and 4; nor can there be a lending of the city's credit in contravention of Article VI, Section 29." (footnotes omitted)).
[26] Section 11-28-2, Ala.Code 1975, provides:

"In addition to all other warrants which any county shall have the power to issue pursuant to laws other than this chapter, the county shall have the power from time to time to sell and issue warrants of the county for the purpose of paying costs of public facilities. . . . "
[27] We noted that "[b]asically, the Shelby County Commission made a decision to refinance certain debts because of a substantial drop in interest rates." 641 So.2d at 260.
[28] Section 215 has since been amended to provide that the proceeds of taxes levied under § 215 "in excess of amounts payable on bonds, warrants, or other securities issued by the county may be spent for general county purposes. . . ." Amendment No. 208, proposed by Act No. 17, Ala. Acts 1961.
[29] The Chism plaintiffs point to comments at the Constitutional Convention of 1901 to support their contention. However, our review of those debates leads us to believe that the issue before the Conventionwhether a § 215 tax must be included in the § 224 debtwas unresolved.

Mr. Kirk of Colbert County (because Colbert County was already beyond the proposed debt limit) proposed to allow for additional debt, beyond the constitutional debt limit, for extraordinary purposes, such as if the courthouse and bridges in a county were all "swept away." Mr. Kirk expressed his belief that, under § 224, his county could not issue warrants and pay it as the money is collected under a special tax provided for in § 215. Mr. Coleman (Greene County) was uncertain as to Mr. Kirk's construction: "I will make no further argument other than to say it would require time and study to answer the question, and I do not feel like giving an impromptu answer as to whether the provision for a special tax would be controlled by the general provision. I am inclined to think the special tax would stand as against the general law, but as to that, I would not undertake to inform the Convention." 2 Official Proceedings of the Constitutional Convention of 1901, p. 1492. Mr. O'Neal likewise seemed to question Mr. Kirk's interpretation: "Could you not issue warrants and pay it as the money is collected under that tax?" 2 Official Proceedings, p. 1486. Mr. Kirk's proposed amendment failed; thus, perhaps the convention rejected Mr. Kirk's construction. Nonetheless, the records of the Convention to which the Chism plaintiffs direct us do not enlighten us one way or the other on that issue.
[30] Section 215, Ala. Const.1901, limited a county's authority to levy taxes on property ("No county in this state shall be authorized to levy a greater rate of taxation, in any one year, on the value of the taxable property therein, than one-half of one per centum. . . . ").
[31] See Ala. Const.1901, § 215.
[32] The Court in Town of Georgiana questioned the significance of this statement in Wharton.
[33] See South Cent. Bell Tel. Co. v. State, 789 So.2d 133, 145 (Ala.1999) ("We stated [in Opinion of the Justices No. 289, 410 So.2d 388 (Ala.1982),] that the framers' failure to use in § 229 language parallel to that used in § 232 was convincing evidence that the framers did not intend to allow such apportionment with regard to domestic corporations.").
[34] Edmonson dealt with the creation of debt by the State under § 213, Ala. Const.1901, a provision parallel to § 215.
[35] This Court has been mindful that "substance rather than mere form" of the indebtedness matters. Acker, 641 So.2d at 261 ("While courts must be careful to see that the indebtedness limitation is strictly observed, they should remember that the limitation is aimed at actual, rather than theoretical, indebtedness, and they should look to substance rather than mere form."). Here the general credit of Jefferson County is not implicated because the debt is to be paid with a new source of revenue that is not otherwise available for general governmental purposes; therefore, the danger that Jefferson County will not be able to pay the debt from its general revenues is eliminated. There is no additional burden on the County's general revenues, and the constitutional concern the framers sought to address by imposing a debt limit is not present.
[36] We do not necessarily agree with the trial court's statement and its resulting conclusion that the Chism plaintiffs' dispute with the facts proffered by Jefferson County is not material. However, we may affirm a trial court's judgment if it is correct for any reason. The Chism plaintiffs failed to produce substantial evidence indicating a genuine issue of material fact on this point.
[37] Section 16-13-231 was amended effective March 26, 2006, to provide that the student population would be determined by the number of pupils in average daily membership during the first 20 scholastic days after Labor Day of the preceding school year. Act No. 2006-251, Ala. Acts 2006.
[38] The majority notes that Jefferson County "obtained the agreement of each local school board to use the proceeds of the education warrants solely for the acquisition or improvement of school buildings and/or the acquisition of capital equipment or, alternatively, for the retirement of debt previously incurred for such purposes," and that the State superintendent of education has reviewed and approved the consents. 954 So.2d at 1061-62 (footnote omitted). However, those consents and approval cannot legitimate Jefferson County's interpretation of § 40-12-4. Given the apparent choice of receiving the restricted funds pursuant to this scheme versus receiving no funds at all, what local board would ever fail to agree? This choice begs the unanswered question of whether those local boards, if given a different choice, would have preferred receiving unrestricted tax revenues to use for the local board's own prioritized needs, rather than the tax-anticipation warrant proceeds earmarked for school construction or debt retirement, whether the local board desired it or not.

It is also stating the obvious to note that Jefferson County cannot obtain the agreement of local boards created in Jefferson County after this proceeding.
[39] A separate agreement was entered into whereby the Jefferson County Board of Education agreed that the newly formed Trussville Board of Education, which had no students in 2003 and thus no basis on which to claim a share of the grant fund, would receive a share of the proceeds in the grant fund established by the trust indenture.
[40] The same inequitable result would occur when any municipality annexed territory previously within the purview of a county system. The municipality would then have more students to educate, yet no benefit from the distribution of the tax revenues collected based upon 2003 population figures. Conversely, the county board of education would continue to reap the benefits of sales taxes collected in the future, although it would be responsible for educating fewer students as a result of the municipal annexation.
[41] Section 16-3-11, Ala.Code 1975, provides:

"The State Board of Education shall exercise, through the State Superintendent of Education and his professional assistants, general control and supervision over the public schools of the state, except institutions of higher learning which by law are under the general supervision and control of a board of trustees, and shall consult with and advise through its executive officer and his professional assistants, county boards of education, city and town boards of education, superintendents of schools, school trustees, attendance officers, principals, teachers, supervisors and interested citizens, and shall seek in every way to direct and develop public sentiment in support of public education."
(Emphasis added.)
Section 16-8-8, Ala.Code 1975, provides:
"The general administration and supervision of the public schools of the educational interests of each county, with the exception of cities having a city board of education, shall be vested in the county board of education; provided, that such general administration and supervision of any city having a city board of education may be consolidated with the administration and control of educational matters affecting the county and vested in the county board of education."
(Emphasis added.)
Section 16-11-9, Ala.Code 1975, provides:
"The city board of education is hereby vested with all the powers necessary or proper for the administration and management of the free public schools within such city and adjacent territory to the city which has been annexed as a part of the school district which includes a city having a city board of education."
(Emphasis added.)
[42] The majority notes Jefferson County's contention that the County's single large financing had several advantages over smaller financings by the individual boards, such as structuring part of the debt with a variable interest rate. This may have been a financial bonus if Jefferson County was a private-sector organization. Any financial savings would not be a valid reason to disregard the mandates of § 40-12-4.
[43] The majority noted a response at oral argument by counsel for the Chism plaintiffs in response to a question by Justice See. The entirety of this colloquy states:

Justice See:
"Let me ask you to respond to Mr. Slaughter, in Section 40-12-4(a), the language says `all the proceeds from any tax levied pursuant to this section less the cost of collection thereof shall be used exclusively for public school purposes, including specifically and without limitation, capital improvements and the payment of debt service on obligations issued therefor.' And I think you know his point is it doesn't say school boards, and so why can't the county make capital improvements, issue debt in order to do that, and have these funds to pay off that debt?"
Counsel for the Chism plaintiffs:
"Subsection (b) modified by requiring in counties with more than one board of education that the funds be distributed to the various local boards. Now, in Mobile you could use that and not have to distribute to the local boards because there's only one local board. But where you have more than one you have to do it that way and that is what has happened."
Justice See:
"Ok, but now it doesn't say to local boardsit says on the same basis as within such county on the same basis of the total calculated cost for the Foundation Program for these local boards of education within the county."
Counsel:
"And those are by virtue of the Foundation Program required to be distributed."
Justice See:
" based on the number, on the cost, the student burden basically."
Counsel:
"But many, many local boards have taken their shares of this tax, pledged those for capital-improvement bonds for schools in their system. This is the first time, as I say, it's ever been attempted to be done in a different way, not by the local boards, but by the county itself. We just say that's not permitted by the statute."
(Emphasis added.)
Therefore, again assuming that such concession was made, it was made only in connection with the argument that § 40-12-4(b) modifies the subsection (a) in response to a question propounded by Justice See to properly reflect that Jefferson County, unlike Mobile County, had more than one school board. However, counsel's last sentence is consistent with all of the arguments made by the Chism plaintiffs pertaining to the distribution of revenues.
[44] Section 16-13-70, Ala.Code 1975, provides:

"(a) Any county board of education and any city board of education may issue and sell interest-bearing tax anticipation warrants for the purpose of paying the costs of erecting, acquiring, providing, constructing, purchasing, altering, enlarging, improving, repairing and equipping school buildings, school playgrounds and buildings for housing and repairing school buses, and for the purpose of purchasing school buses, or for any one or more of such purposes.
"(b) Warrants issued under the provisions of this article shall not be general obligations of the board of education issuing such warrants but shall be payable, as to both principal and interest, solely out of one of the following:
"(1) The proceeds of any ad valorem tax voted under the constitution for the purpose of paying such warrants, or for school purposes generally, and paid, apportioned or allocated to or for the benefit of the board of education issuing such warrants;
"(2) The proceeds of any ad valorem tax that may be paid, apportioned or allocated to or for the benefit of the board of education issuing such warrants; or
"(3) The proceeds of any privilege, license or excise tax or taxes that may be paid, apportioned or allocated to or for the benefit of the board of education issuing such warrants.
"(c) Any board of education issuing any warrants hereunder shall specify, in the proceedings authorizing such warrants, the tax proceeds out of which such warrants are to be payable and shall secure payment of the principal thereof and the interest thereon by a pledge of so much as may be necessary therefor of such tax proceeds. . . . "
(Emphasis added.)
[45] Observers believe that state and local governments have become so heavily dependent on sales tax because no statewide referendum is required to increase the sales and use tax at either the state or local level, just as the taxing decision was made in this case pursuant to § 40-12-4, without a vote of the citizens. Bruce Ely and Howard Walthall, State Constitutional Limitations on Taxing and Spending: How Alabama Compares, 13 J. Multistate Tax'n 24 (2003).
[46] One result of the exceptionally strong structural protections of the Alabama Constitution is that Alabama citizens' overall tax burden this year is the lowest in the nation, according to the Tax Foundation. "Tax Freedom Day"the day in which a worker's cumulative gross earnings would cover all his federal, state, and local taxes for the year fell on April 11 in Alabama. By comparison, the national average is April 26, and in Connecticut Tax Freedom Day falls on May 12, nearly a month later than in Alabama. Moreover, because of the higher average income in Connecticut, its per person tax bill is $10,120 higher than in Alabama. See Tax Foundation Special Report No. 140 (April 2006).

Similarly, according to Americans for Tax Reform, Alabamians' burden from civil government spending and regulation at all levels is also the lowest in the United States. "Cost of Government Day" this year fell on June 25 in Alabama. By comparison, in Connecticut, the state which most burdens its residents, the Cost of Government Day fell on July 30. See Cost of Government Day Report (2006).
[47] Interestingly, when Mr. Sanford uttered this lament in 1901, the average national total effective tax rate, at 5.8%, was less than 1/5th of the current 2006 figure of 31.6%, according to the Tax Foundation. See Tax Foundation Special Report No. 140, pp. 2, 4 (April 2006).
[48] The only authority cited by the majority opinion in support of its scenario that my understanding of the plain meaning of the constitutional text will prevent Jefferson County from entering into any long-term contracts is a Utah case that applies to public corporations or to bond issues paid for by the project funded by the bonds (e.g., toll roads paying for highway bonds). Neither is applicable in this case. 954 So.2d at 1077 n. 25.
[49] The majority opinion's final effort to avoid applying the plain-meaning rule in this case is to criticize as incomplete my application of the plain-meaning rule to the debt-limit provision. I freely acknowledge that my application of the rule to the constitutional text could be more fully developed. But such is not required for this dissent, which need only point out that the majority completely fails to follow the proper rule. An abbreviated application of the proper rule is inherently better than no application at all. Consequently, absent such application, the majority opinion fails to persuade, notwithstanding its unusual length.
[50] The majority opinion, although "mindful that `substance rather than mere form' of the indebtedness matters," argues that the debt warrants do not, substantively, increase Jefferson County's total debt, in that "the general credit Jefferson County is not implicated because the debt is to be paid with a new source of revenue. . . ." 954 So.2d at 1085 n. 35.

This argument is not persuasive. As even the majority opinion recognizes, "debt" incurred by Jefferson County is at issue, and it begs the question to assert that the debt limits under § 224 are not violated if a county matches an impermissible debt increase with a new tax specially allocated to pay that debt.
In fact, the issue whether the education warrants are backed by Jefferson County's full faith and credit is a red herring. Full faith and credit pertains to technical particulars of the debt itselfe.g., (1) the interest rate at which Jefferson County has to pay the education warrants; (2) the creditworthiness of the education warrants; and (3) the rights of the holders of the education warrants should Jefferson County default on the warrants not whether debt in substance, as well as form, exists.
[51] The federal government also uses the substance-over-form standard in prosecuting taxpayers for tax evasion. See Donald L. Korb, Shelters, Schemes and Abusive Transactions: Why Today's Thoughtful U.S. Tax Advisors Should Tell Their Clients to "Just Say No," 707 Prac. Law Inst. 9 (2006), and Jeff Rector, A Review of the Economic Substance Doctrine, 10 Stan. J.L. Bus. & Fin. 173 (2004). I see no reason why this Court should exempt Jefferson County from the same strict scrutiny of its efforts to evade the law.
[52] Although Dillon's treatise addresses the debt limits of municipal corporations, the same logic is applicable to county debt limits. This Court has cited to caselaw for the two interchangeably. For example, in Town of Georgiana, this Court applied § 224 caselaw in determining whether a municipality had exceeded its constitutional debt limit. The Court stated: "We see no reason why [§ 224 cases and reasoning] may not be said of the restraint placed on cities and towns by § 225." 265 Ala. at 658, 93 So.2d at 497. The reverse application is likewise permissible.
[1] The majority opinion cites Tribe v. Salt Lake City Corp. and Redevelopment Agency, 540 P.2d 499 (Utah 1975), as support for many of the other Edmonson principles, but that case, like Edmonson, involved a public corporation not subject to constitutional debt limitations issuing bonds funded by parking revenues and local tax increments.